UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
             :

UNITED STATES OF AMERICA          :
             :

        - v. -           :        15 Cr. 457 (KPF)
             :

KATERINA ARVANITAKIS,        :
             :
             :

           Defendant.     :
             :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA**

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
Attorney for the United States of America

Katherine Reilly
Noah Solowiejczyk
Assistant United States Attorneys
    - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
UNITED STATES OF AMERICA                      :
                                              :
        - v. -                                :        15 Cr. 457 (KPF)
                                              :
KATERINA ARVANITAKIS,                         :
                                              :
                                              :
                Defendant.                    :
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## SENTENCING MEMORANDUM

The defendant is scheduled to be sentenced in this matter on March 8, 2018 at

4:00 p.m.  The Government respectfully submits this memorandum in advance of that

sentencing.  As set forth in the Presentence Investigation Report ("PSR"), the United States

Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range applicable to this defendant is 27 to

33 months' imprisonment.  For the reasons set forth below, the Government submits that the

Court should impose a sentence within the Guidelines range in this case.

## BACKGROUND

**I.        The Offense Conduct**

At all times relevant, Arvanitakis was an attorney admitted to practice in the State of New

York.  (PSR ¶ 15).[1]  Arvanitakis' co-defendant, Brandon Lisi (an attorney who had been

disbarred in New York State in or about July 2011) worked at the offices of Arvanitakis.  From

at least in or about 2010 through 2014, Arvanitakis and Lisi worked together to defraud various

---

[1] Arvanitakis was disbarred on or about May 17, 2017, following her guilty plea in the instant
case.

clients of theirs by soliciting funds from these clients based on fraudulent misrepresentations about how the solicited funds were going to be used.[2] (PSR ¶ 16).

   A. *Victim-1*

Among the individuals defrauded by Lisi and Arvanitakis was a widow ("Victim-1") with two children who had recently received approximately $500,000 in connection with the death of her spouse. (PSR ¶ 17). In or about August 2010, Victim-1 retained Arvanitakis as legal counsel in connection with, among other matters, a potential wrongful death claim relating to Victim-1's late husband and a pending foreclosure action regarding Victim-1's residence. Victim-1 paid Arvanitakis a $6,500 retainer. (PSR ¶ 17). In or about April 2011, Lisi and Arvanitakis met with Victim-1 at Victim-1's home, and advised Victim-1 that they could assist her by investing the approximately $500,000 Victim-1 had received in insurance proceeds as a result of the death of Victim-1's spouse. (PSR ¶ 18). Victim-1 agreed and transferred the $500,000 to a bank account controlled by Arvanitakis. Lisi and Arvanitakis represented to Victim-1 would be used for certain purported investment opportunities, including in particular real estate properties.

Between in or about 2011 and in or about 2012, Arvanitakis diverted substantial portions of Victim-1's funds for purposes other than the investment opportunities, including the acquisition of the real estate properties, as had been previously promised to Victim-1 by Lisi and Arvanitakis. (PSR ¶ 18). Between in or about May 2011 and in or about June 2011, Lisi and Arvanitakis visited Victim-1's home on multiple occasions and advised her about the purported

---

[2] While Arvanitakis concedes in her submission that "fraudulent representations were made to the victims in this case relating to their investments," (Def. Mem. At 9), the recitation of the offense conduct in Arvanitakis' submission – unsupported by any citation to the PSR – is largely self-serving and, at times, inaccurate. Arvanitakis filed no objections to the summary of the offense conduct contained in the PSR and the Court should rely on the facts set forth in the PSR in assessing the nature and seriousness of the offense under Section 3553(a).

investment opportunities. (PSR ¶ 19). In May 2011, Lisi and Arvanitakis visited Victim-1's home and presented Victim-1 with a form authorizing the release of approximately $30,000 of Victim-1's funds being held in Arvanitakis' bank account for the purported purpose of an "investment" in the form of a loan to an individual ("Individual-1") which was to be used to purchase an automobile. (PSR ¶ 19). Lisi and Arvanitakis informed Victim-1 that that the loan would be secured by a promissory note purportedly singed by Individual-1, and the car would be collateral for the loan. The promissory note promised Victim-1 repayment over a period of five years. Victim-1 signed a document authorizing the release of the funds for use as a loan to Individual-1. Victim-1 never received any payments on the purported loan, and Lisi later told Victim-1 that the loan had not, in fact, been made to Individual-1. Instead, Lisi claimed that the funds had been lent to yet another individual. In reality, a substantial portion of the $30,000 was transferred by Arvanitakis to an account from which these funds were used to pay off a debt on behalf of Lisi. (PSR ¶ 19).

In May 2011, Lisi and Arvanitakis induced Victim-1 to release an additional $150,000 from the funds previously transferred to Arvanitakis, purportedly as an investment in a property in Cold Spring Harbor Property (the "Cold Spring Harbor Property").[3] (PSR ¶ 20) Lisi and Arvanitakis told Victim-1 that Victim-1 was purchasing a second mortgage on the Cold Spring

---

[3] As the Court is aware from the Government's submission in connection with the sentencing of Ms. Arvanitakis's co-defendant, Lisi was arrested and separately charged by the Office of the District Attorney for Suffolk County in connection with fraudulent real estate and mortgage loan transactions in 2007 and 2008 involving, among other properties, the Cold Spring Harbor Property. Lisi purchased the Cold Spring Harbor property through an LLC he controlled, Clear Blue Water, LLC. In order to get a mortgage loan for the Cold Spring Harbor Property after Clear Blue Water had purchased it, Lisi and his co-conspirators in the Suffolk County case submitted fraudulent documents to Washington Mutual Bank, including documents concealing Clear Blue Water's September 2007 purchase, falsified leases, and falsified contract documents. Lisi operated a restaurant at this location for a period of time; the restaurant eventually went out of business.

Harbor Property, which would eventually permit Victim-1 and potential co-investors to purchase the Cold Spring Harbor Property and to collect rent from its tenants.  Lisi and Arvanitakis did not disclose that the Cold Spring Harbor Property was one of several real estate properties that were the subject of the Suffolk County Indictment filed against Lisi and others.  (PSR ¶ 20).  Victim-1 never received any payments in connection with the "investment" in the Cold Spring Harbor Property.  (PSR ¶ 20). Furthermore, certain portions of the $150,000 Victim-1 agreed to release in connection with the Cold Spring Harbor Property were diverted by Lisi and Arvanitakis for the payment of personal expenses and as cash withdrawals. (PSR ¶ 20).

In June 2011, Lisi induced Victim-1 to release an additional $150,000 of from the funds previously transferred to Arvanitakis purportedly as a loan to Lisi to pay his criminal attorney. In seeking the loan Lisi claimed, among other things, that he planned to pay the attorney significantly less than $150,000 and that he would be able to return the remaining funds to Victim-1 relatively quickly.  Lisi provided Victim-1 with a promissory note stating that the loan would be repaid with interest over a 10-year period.  Victim-1 never received any payments on the loan.  (PSR ¶ 21).

In June 2011, Lisi and Arvanitakis also induced Victim-1 to release an additional $100,000 from the funds previously transferred to Arvanitakis purportedly to invest in a property located in Sag Harbor (the "Sag Harbor Property").[4] (PSR ¶ 22).  Lisi and Arvanitakis told Victim-1 that she would be purchasing both first and second mortgages on the Sag Harbor Property, which would eventually permit Victim-1 and potential co-investors to operate the Sag

---

[4] As the Court is aware from the Government's submission in connection with the sentencing of Ms. Arvanitakis's co-defendant, Brandon Lisi, Lisi was arrested and separately charged by the Office of the District Attorney for Suffolk County in connection with fraudulent real estate and mortgage loan transactions in 2007 and 2008 involving, among other properties, the Sag Harbor Property.

Harbor Property as a bed and breakfast. Lisi and Arvanitakis did not disclose that the Sag Harbor Property was one of several real estate properties that were the subject of the Suffolk County Indictment against Lisi. (PSR ¶ 22). Certain portions of this $150,000 that Victim-1 agreed to release in connection with the Sag Harbor Property were diverted by Lisi and Arvanitakis for the payment of personal expenses and as cash withdrawals (PSR ¶ 22).

In the course of inducing Victim-1 to "invest" the funds described above, Lisi and Arvanitakis created a real estate company ("Company-1") designed to pool the funds provided by Victim-1 with funds provided by other victims of their scheme. (PSR ¶ 23). On or about July 25, 2012, a Chapter 11 bankruptcy petition was filed with respect to Company-1 in the United States Bankruptcy Court for the Eastern District of New York. Company-1 claimed to own the Cold Spring Harbor Property. On or about August 14, 2012, Victim-1, acting at the direction of Lisi, appeared before the United States Bankruptcy Court for the Eastern District of New York and asserted falsely, among other things, that Company-1 purchased the Cold Spring Harbor Property from a co-conspirator of Lisi and Arvanitakis and that Victim-1 had only heard of Lisi but that he was not involved in Company-1's purchase of the Cold Spring Harbor Property. (PSR ¶ 23).

Over the course of 2012, Victim-1 became concerned about the status of Victim-1's purported investments—none of which had produced any returns—and began asking Lisi and Arvanitakis to return Victim-1's money, which Victim-1 required to pay the living expenses Victim-1 and Victim-1's children were incurring. (PSR ¶ 24). On occasion, for example, Victim-1 sought the return of money to pay for gifts or school clothing for Victim-1's children or to pay for holiday expenses, such as the purchase of a Thanksgiving turkey. Lisi and Arvanitakis repeatedly told Victim-1, among other things, that the money was tied up in investments and that

Victim-1 could not be trusted to manage the money herself. Over the course of 2012, Lisi and Arvanitakis returned only approximately $4,400 to Victim-1. (PSR ¶ 24).

### B. Victim-2 and Victim-3

Lisi and Arvanitakis also defrauded a husband and wife ("Victim-2" and "Victim-3", respectively). In or about 2010, Victim-2 retained Arvanitakis as legal counsel in connection with a legal dispute concerning a property located in Queens County, New York. (PSR ¶ 25). From approximately in or about 2010 up to and including in or about 2013, Arvanitakis and Lisi induced Victim-2 and Victim-3 to send hundreds of thousands of dollars, including by wire transfer, to bank accounts controlled by Arvanitakis based on representations that these funds would be used for certain purported investment opportunities, including investments in particular real estate properties. In truth and fact, a significant portion of the funds provided by Victim-2 and Victim-3 were diverted for purposes other than the purported investment opportunities, including the acquisition of the real estate properties, as had been previously promised. (PSR ¶ 25).

In or about April 2011, Victim-2 and Victim-3 wired approximately $650,000 to an account controlled by Arvanitakis, purportedly to invest in the purchase of the Cold Spring Harbor Property. (PSR ¶ 26). Lisi and Arvanitakis later informed Victim-2 and Victim-3 that they could not yet invest in the Cold Spring Harbor Property and proposed instead that they invest in a catering hall located in Long Island, New York (the "Catering Hall Property"). Lisi and Arvanitakis represented that the investment in the Catering Hall Property would be a short-term investment that would allow Victim-2 and Victim-3 to have the invested funds— approximately $450,000—returned to them, with a significant additional return, within a short period of time, before the investment in the Cold Spring Harbor Property would be available.

(PSR ¶ 26). When that period of time had passed, Victim-2 and Victim-3 began to seek the return of their money from Lisi and Arvanitakis, who assured Victim-2 and Victim-3 that though they could not get their money back at that time, they would be provided additional returns when the money was eventually returned. To date, Victim-2 and Victim-3 have not received the money invested in the Catering Hall Property back, despite repeated demands made upon Lisi and Arvanitakis. (PSR ¶ 26).[5]

In or about January 2012, Lisi and Arvanitakis represented to Victim-2 and Victim-3 that they could purchase a property located in Astoria, New York (the "Astoria Property") by making payments to the bank holding the existing mortgage and the current owners (the "Astoria Owners"), who held substantial equity in the Astoria Property. (PSR ¶ 27). Victim-2 and Victim-3 then caused $250,000 to be transferred to an account controlled by Arvanitakis to purchase the equity in the Astoria Property from the Astoria Owners. (PSR ¶ 25). Arvanitakis represented that Victim-2 and Victim-3 could only collect rent from the tenants living in the Astoria Property through a company she controlled, charging Victim-2 and Victim-3 a significant fee as a result. (PSR ¶ 27). Of the $250,000 transferred to Arvanitakis to purchase the equity stake in the Astoria Property, however, less than $7,000 was, in actuality, transferred to the Astoria Owners. Victim-2 and Victim-3 never received the deed to the Astoria Property and do not own the Astoria Property, despite representations by Lisi and Arvanitakis that by

---

[5] The majority of the funds invested in the Catering Hall Property by Victim-2 and Victim-3 are currently held in an escrow account belonging to an attorney involved in the Catering Hall Property deal and Victim-2 and Victim-3 have sued this attorney for the return of these funds. Lisi and Arvanitakis referred Victim-2 and Victim-3 to this attorney and worked with this attorney on multiple occasions on cases and deals related to their interactions with Victims-1, 2, 3, and 4.

providing the $250,000 they would ultimately become owners of the Astoria Property. (PSR ¶ 27).

Later in or about 2012, Lisi and Arvanitakis represented to Victim-2 and Victim-3 that they could purchase an ownership interest in the Sag Harbor Property, which could be converted for use as a bed and breakfast. Lisi and Arvanitakis did not disclose that the Sag Harbor Property was one of several real estate properties that were the subject of the Suffolk County Indictment against Lisi. Based in part on Lisi's and Arvanitakis's representations regarding the Sag Harbor Property, Victim-2 and Victim-3 invested more than $178,000 in the Sag Harbor Property. Victim-2 and Victim-3 have never received any ownership interested in the Sag Harbor Property, nor any return on their "investment." (PSR ¶ 28).

### C. Victim-4

Finally, among the individuals defrauded by Lisi and Arvanitakis was an individual ("Victim-4"), who received who received several hundred thousand dollars in an inheritance. From approximately 2012 through 2013, Lisi and Arvanitakis induced Victim-4 to retain Arvanitakis as legal counsel and then made misrepresentations concerning purported real estate transactions in order to obtain and retain over $100,000 from Victim-4. (PSR ¶ 29).

### D. Diversion of Victim Funds

From in or about 2010 through in or about 2014, Lisi and Arvanitakis used the funds that they obtained by fraud from Victims-1, -2, -3, and -4 in the following ways, among others: to repay debts that Lisi and Arvanitakis owed; to replenish bank accounts they controlled that carried negative balances; for personal expenditures; to transfer to relatives; and to make substantial cash withdrawals, all contrary to the representations made to the victims and without disclosing the true uses of the funds to the victims. (PSR ¶ 30). Certain examples of such

unauthorized diversion of victim funds are described in the PSR. (PSR ¶¶ 31-33). By way of example, in or about July 2013, Arvanitakis caused numerous transfers from Victim-4's funds that caused the depletion of over $100,000 of those funds, including, among others, on or about July 12, 2013, Arvanitakis caused the issuance of a cashier's check payable to Lisi's mother in the amount of approximately $20,000, and, on or about July 24, 2013, Arvanitakis caused a transfer to an account held in the name of Lisi's mother in the amount of approximately $1,842. (PSR ¶ 33).

In total, as a result of their participation in the above-described scheme, Lisi and Arvanitakis caused Victims-1, 2, 3, and 4 losses totaling approximately $1,484,492. (PSR ¶ 34).

## II.        The Charges and Guilty Plea

Indictment, 15 Cr. 457 (KPF) charged Lisi and Arvanitakis in Count One with conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349; in Count Two with conspiracy to commit bankruptcy fraud, in violation of Title 18, United States Code, Section 371; and in Count Three with conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h).

On or about May 3, 2017, the Grand Jury returned Superseding Indictment S1 15 Cr. 457, which charged Arvanitakis in five counts with: (i) conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349 (Count One); (ii) wire fraud, in violation of Title 18, United States Code, Section 1343 (Count Two); (iii) conspiracy to commit bankruptcy fraud and to make false oaths and claims in bankruptcy, in violation of Title 18, United States Code, Section 371 (Count Three); aggravated identity theft, in violation of Title 18, United States Code, Section 1028A; and conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h). (Dkt. No. 70).

Pursuant to a plea agreement with the Government, Arvanitakis pleaded guilty before Magistrate Judge Gabriel W. Gorenstein on May 16, 2017 to Count Two of the Indictment. Arvanitakis' plea was accepted by the Court on or about May 17, 2017. (Dkt. No. 80).

### III.     The Applicable Guidelines Range

The plea agreement and the PSR are in accord with respect to the calculation of the Guidelines Range. The November 1, 2016 Guidelines Manual applies.[6] See U.S.S.G. § 1B1.11. The base offense level is 7 pursuant to U.S.S.G. § 2B1.1(a)(1). A 14-level increase is warranted pursuant to U.S.S.G. § 2B1.1(b)(1)(H) because the loss amount was between $550,000 and $1,500,000. A two-level increase is warranted pursuant to U.S.S.G. § 2B1.1(b)(2)(A) due to the substantial financial hardship caused to the victims. A two-level decrease is warranted pursuant to U.S.S.G. §3B1.2(b) because the defendant was a minor participant in the criminal activity. Assuming that the defendant clearly demonstrates acceptance of responsibility, a three-level reduction will be warranted pursuant to U.S.S.G. § 3E1.1(a) and (b), resulting in a total offense level of 18. (PSR ¶ 44-54). Arvanitakis has zero criminal history points and her Criminal History Category is I. (PSR ¶ 57). Accordingly, with a total offense level of 18 and a Criminal History Category of I, the Guidelines Range is 27 to 33 months' imprisonment. (PSR ¶ 98).

---

[6] The 2014 Guidelines, which were in place at the time the charged offense concluded, would result in the same total offense level and applicable Guidelines Range as set forth above, albeit through a different calculation. While the 2014 Guidelines did not include a two-level enhancement for substantial financial hardship caused to the victims, the base offense level would be increased by 16 levels rather than 14 levels if applying the 2014 Guidelines based on a loss amount of $1,484,492. See U.S.S.G. § 2B1.1 (b)(1)(I) (2014). Accordingly the total offense level under the 2014 Guidelines is also 18.

**<u>DISCUSSION</u>**

In light of the nature and circumstances of the instant offense, a Guidelines sentence is appropriate in this case.

**I.     A Guidelines Sentence is Warranted in this Case.**

  *A. A Guidelines Sentence is Necessary to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Impose Just Punishment.*

Katerina Arvanitakis stole almost $1.5 million from her victims, carrying out a scheme that had serious and lasting consequences for the individuals who found themselves taken advantage of and lied to by Arvanitakis and her co-defendant, Brandon Lisi. A Guidelines sentence is necessary to reflect not only the seriousness of the offense, but to promote respect for the law, and to justly punish the conduct at issue.

    1. <u>The Impact on Victims</u>

The defendant was involved in a scheme, which involved repeatedly lying to victims in an effort to induce them to "invest" in various real estate and other projects, which Arvanitakis and Lisi promised would yield them profits. The amount of money at issue – almost $1.5 million – is substantial, and the punishment imposed in this case should reflect the magnitude of the intended and actual financial loss associated with the defendant's crime. It is worth noting, however, that even this significant dollar figure understates the real impact of the criminal conduct in this case on the defendant's victims.

Indeed, the defendant and her co-defendant, Brandon Lisi, selected victims who were vulnerable. The defendant preyed on Victim-1, for example, after the death of her husband. (PSR ¶ 17). Victim-1 told the defendant that she and her children needed to live on the money she had inherited as a result of her husband's death; she also told the defendant she was facing foreclosure on her family home. Nevertheless, the defendant and her co-defendant took

11

advantage of Victim-1's misfortune, taking nearly all of the funds she had inherited and forcing Victim-1 to seek the return of even the small sums she needed to pay her family's expenses, like the purchase of school clothes for her children or a turkey for Thanksgiving dinner. (PSR ¶ 24).

Though Victims-2 and 3 were more financially sophisticated in terms of their experience in the real estate market than Victim-1, see (PSR ¶ 25) (noting that Victims-2 and 3 retained the defendant in connection with a dispute over property in Queens County), the defendant and her co-defendant defrauded Victims-2 and 3, a husband and wife, at a time when they were about to become parents for the first time and were dealing with Victim-2's medical issues, which prevented Victim-2 from working full time. Victims-2 and 3 also lost hundreds of thousands of dollars in this scheme, just as their family was expanding and they were facing increased financial demands.

Moreover, each of Victims-1, 2, 3, and 4 encountered the defendant in the context of seeking legal counsel. They believed they could trust her, their attorney, and came to view serial fraudster Brandon Lisi, Arvanitakis's co-defendant, as an associate and adviser of Arvanitakis's.

The financial loss in this case also understates the seriousness of the offense because it does not include the costs—both economic and emotional—imposed upon the defendant's victims as a result of their involvement in years of civil litigation (including at least one suit initiated by the defendant against her victims), some of which is still ongoing. These suits relate not just to victims' efforts to recoup some of their funds but also to their need to fend off a variety of claims asserted by those who worked with the defendant or were otherwise caught up in the web of fraudulent real estate and business dealings she and Lisi left in their wake. The legal costs that have resulted from these efforts are significant and have further deprived the victims in this case of financial security. Moreover, the emotional and mental strain imposed on

these victims as a result of the ongoing litigation has prevented them from attempting to bring any sense of normalcy to their lives; rather, they are still attempting to dig themselves out of the holes the defendant and her co-defendant dug for them.

## 2. The Defendant's Role

The defendant seeks an extraordinarily lenient sentence, asking this Court to "spare Ms. Arvanitakis a prison sentence," despite the fact that the Guidelines suggest that a sentence of 27 to 33 months is appropriate. (Def. Mem. at 18). In arguing for such a sentence, the defendant focuses, in large part, on her role relative to her co-defendant, emphasizing that she purportedly "occupie[d] the unenviable role of both victim and conspirator" and noting, repeatedly, the centrality of Lisi's actions in perpetrating the fraud. *See, e.g.*, (Def. Mem. at 3, 10). At the outset, the Guidelines range applicable to the defendant already reflects her role relative to Lisi and her level of participation and culpability. Indeed, as noted in the PSR, the offense level applicable to the defendant's conduct was reduced by two levels in recognition of the fact that she was a "minor participant" in the criminal conduct to which she pleaded guilty. (PSR ¶ 9). Accordingly, the plea agreement in this case already reflects a measured approach to the offense and significant leniency toward the defendant, and the Government respectfully submits that further leniency is unwarranted. The defendant should not doubly benefit from her role as a minor participant in the scheme to defraud; she did, in fact, participate, and a sentence in the range of 27 to 33 months' imprisonment is sufficient but not greater than necessary to adequately reflect her role in what was a serious criminal offense.

Moreover, the defendant's characterization of her criminal conduct in her sentencing submission suggests a failure to fully understand the significant impact that her own choices had on her victims.

The defendant notes, for example, that she was aware that Lisi had been indicted twice in this District "but did not extricate herself from the situation which would eventually precipitate her downfall" because "[s]he was in love with Brandon Lisi by this time," "was blinded by his denials," and "believed that he would avoid a prison sentence." (Def. Mem. at 8). The defendant did not just stand by Lisi, however, as he navigated the criminal charges he was facing. She allowed him access to her law office and to certain of her clients, played an active part in the fraud he undertook while out on bail, and hid from victims the fact that some of the properties in which those victims were purportedly "investing" were in fact the subjects of criminal charges facing Lisi. Moreover, while Lisi took a significant portion of the victims' funds for himself, there is no denying that a substantial portion of the victims' funds were used by Arvanitakis for her own personal expenses and to make up for shortfalls in her own bank accounts. Arvanitakis does not deny – nor could she – that she knew misrepresentations were made to the victims and that she knew these victims' funds were often used by both herself and Lisi for purposes other than the purported real estate investments.

In seeking leniency, the defendant also goes to great lengths to place blame not just with Lisi, but with her victims. With regard to Victim-1, for example, whom the defendant admitted in her allocution to defrauding, (PSR ¶ 9), the defendant describes Lisi's efforts to "facilitate *his* hoodwinking" of Victim-1, (Def. Mem. at 11) (emphasis added). She claims that it was Lisi who defrauded Victim-1 of $30,000 for a car, doctoring a promissory note without her knowledge, (Def. Mem. at 11-12), despite the fact that the PSR (which is not objected to) makes clear it was Lisi and Arvanitakis who presented this doctored promissory note to Victim-1, pitching it as an investment opportunity (PSR ¶ 19). With regard to Victims-2 and 3, the defendant reports that she made monthly payments to them that went "unreimbursed" and were "on Lisi's behalf."

(Def. Mem. 14-15). This grossly mischaracterizes the payments at issue. As set forth in the PSR, Victims-2 and 3 invested substantial sums of money in real estate deals based on misrepresentations by the defendant and her co-defendant. (PSR ¶¶ 25-28). The victims obtained some of this money by taking out mortgages on properties they owned or otherwise incurring debt. In an effort to induce Victims-2 and 3 to leave their money in the fraudulent deals, Lisi and Arvanitakis agreed to pay some of the carrying costs the victims were incurring as a result of having taken on this additional debt. The defendants did not, however, come close to making Victims-2 and 3 whole; they were, in effect, making small payments in an effort to keep the victims requests for the return of their capital—which would result in exposing the fraud—at bay. Moreover, certain of the checks provided to the Court as those purportedly used to pay Victims-2 and 3, (Def. Mem. at 14-15), in fact bounced, as the defendant is well aware.

While the defendant claims that Victim-1 "demand[ed] time" with the defendant and was "frantic" in seeking out the defendant to hold her money in escrow, (Def. Mem. at 12) in reality – and as is set forth in the PSR – the defendant and Lisi approached Victim-1 about assisting her in investing insurance proceeds, prompting Victim-1 to agree to putting her funds in escrow. These funds were later released based upon the fraudulent misrepresentations of the defendants. (PSR ¶¶ 18-22). Similarly, the defendant suggests that it was Victims-2 and 3 who hired an attorney to assist them in the catering hall deal, depositing a substantial sum of money in his escrow account. (Def. Mem. at 14). The defendant neglects to mention, as made clear in the PSR, that the defendant and Lisi arranged for the transfer of the invested funds. (PSR ¶ 26). In fact, it was the defendants who introduced the other attorney to Victims-2 and 3 and involved them in the deal.

### B. Deterrence and Protection of the Public

The imposition of a Guidelines sentence is also necessary to deter the defendant from future crimes and to adequately protect the public.

The defendant suggests that there "is no need for specific deterrence" in this case. (Def. Mem. at 35). The Government begs to differ. As the defendant repeatedly points out, she was a young lawyer when she saw Dustin Dente and Brandon Lisi—well-established attorneys, both— run afoul of the law. Despite this, she nonetheless undertook her own independent pattern of criminal conduct with Lisi. The defendant is a well-educated woman who, by her own account, comes from a loving and supportive family. Despite these advantages—which are far beyond those of many defendants who appear before this Court—the defendant, fully aware of her co-defendant's criminal history, undertook not just to support him or to turn a blind eye to his criminal conduct but to join and facilitate that conduct. While the Government does not dispute that Lisi bore greater responsibility for these crimes, the risk that the defendant, if she were to receive no prison time, would reoffend is not insignificant. Unlike certain other offenses, defendants do not typically "age out" of white collar criminal conduct such as that at issue here. Moreover, as set forth above, the defendant's failure to understand the importance of her own role in the crime and the impact of her conduct on her victims raises the specter that without a significant sentence with the Guidelines range, the defendant may not fully learn from her conviction in the instant case, leaving the public at risk of a future offense by this defendant.

### C. Collateral Consequences

The defendant emphasizes in her submission the "extraordinary" collateral consequences she will suffer as a result of her conviction in this case.[7] (Def. Mem. at 33-34). The loss of her

---

[7] The defendant also relies heavily on her personal history and characteristics in seeking leniency from the Court. In particular, the defendant provides testimonials from friends, among others, as

law license, of course, is an entirely appropriate result given the oath attorneys take upon being admitted to the Bar of the State of New York and the duties attorneys have as officers of the court. That the defendant suffered this entirely predictable consequence of her fraudulent conduct does not mitigate in favor of an exceptionally lenient, non-incarceratory sentence.

The defendant also discusses the impact any period of incarceration will have upon her family, particularly her newborn daughter. The Government does not dispute that the defendant's family will suffer the consequences of her crime, including her absence if she is incarcerated. These consequences, however, are faced by many, if not most, defendants who are sentenced in this District. Accordingly, "[f]amily ties and responsibilities are not 'ordinarily relevant in determining whether a sentence should be outside the guidelines,' 18 U.S.S.G. § 5H1.6, but if family circumstances are extraordinary, they can be considered by the court in making a downward departure." *United States v. Nivar*, No. 02 Cr. 382 (RWS), 2003 U.S. Dist.

---

to her good character. The Government is, for the most part, not in a position to comment on the substance of these testimonials. It is relevant, however, that some of the individuals who provided these letters of support were themselves caught up in the defendant's and Lisi's criminal conduct. As this court is aware, Lisi has used bankruptcy proceedings before to stave off foreclosure or other action, in an attempt to retain control of certain properties. Angelique Mamalakis, one of the individuals writing in support of Arvanitakis, filed a voluntary petition for bankruptcy as to a property in Long Island that was owned by a client of Lisi's (during the period in which he worked with Dustin Dente) who was facing foreclosure. *See In re CSH Ventures LLC*, No. 10-10562 (Bankr. N.D.N.Y.) (the "CSH Ventures Bankruptcy"). On June 17, 2010, Servico, Inc., an attorney service company, filed a letter with the court in the CSH Ventures Bankruptcy contending that Arvanitakis had fraudulently used the company's address in filing the case. *In re CSH Ventures LLC*, Letter from Scott Schuster (Bankr. N.D.N.Y. June 23, 2010) (Dkt. No. 28). The case was eventually dismissed for failure to comply with the local rule requiring representation of debtor corporations by an attorney admitted in the Northern District of New York. *In re CSH Ventures LLC*, Order of Dismissal (Bankr. N.D.N.Y. June 23, 2010) (Dkt. No. 26). Additionally, based upon law enforcement agents' review of bank records associated with the defendant's accounts, on multiple occasions, Melissa Bondi received money from the defendant that came from accounts that held victim funds. The Government similarly is not in a position to assess the claim that the defendant was abused by Lisi. Lisi has contested such a claim. *See* (Lisi Sent. Tr. at 29). To the extent the defendant's relationship with Lisi was abusive in the ways she described, the Government certainly views that as an appropriate factor for consideration by the Court under 18 U.S.C. § 3553(a).

LEXIS 10865, at *11, (S.D.N.Y. June 26, 2003) (citing *United States v. Alba*, 933 F.2d 1117, 1122 (2d Cir. 1991); *United States v. Sharpsteen*, 913 F.2d 59, 63 (2d Cir. 1990)).  The defendant's circumstances are unfortunate, but not extraordinary.  It is clear from the defendant's sentencing submission that her parents are supportive and available to assist in the care of her child, even if they are not in a position to provide full time care; moreover, the defendant's husband is also supportive, appears to be actively engaged with his child, and earns a substantial salary.  (Def. Mem. at 22).  Accordingly, the defendant's family circumstances do not warrant a significantly below-Guidelines sentence.  *See United States v. Smith*, 331 F.3d 292, 294 (2d Cir. 2003) (finding that a downward departure based on family circumstances was not justified where the defendant "was not the sole caregiver or financial supporter of his son" and noting that "[i]t is not unusual…for a convicted defendant's incarceration to cause some hardship in the family."

## II.        The Defendant's Sentence Should Include Full Restitution to Her Victims.

This Court should impose restitution in the amount of $350,000 to Victim-1, $826, 358 to Victims-2 and 3, and $109,035 to Victim-4, with the restitution obligation to be joint and several with that imposed upon the defendant's co-defendant in this matter.[8]

The Guidelines provide that a sentencing court shall, in cases such as this one that arise under the appropriate statutory provisions and involve "an identifiable victim," "enter a

---

[8]        The restitution amounts as to Victims-2 and 3 and Victim-4 differ slightly from those set forth in the PSR.  With regard to Victims-2 and 3, the Government has reviewed documents indicating that $11,134 was returned to those victims in connection with a court bond related to one of the properties at issue in this case.  Additionally, Victims-2 and 3 received a net return of $15,000 (net of legal fees paid to an associate of the defendants) from the other party involved in the catering hall investment.  The Government has, thus, credited those amounts toward the restitution due.  With regard to Victim-4, the Government understands that while Victim-4 initially invested $137,000 in the real estate entity at issue, only $134,035 was actually moved into the relevant account, and $25,000 of that was subsequently returned, resulting in a total restitution amount as to Victim-4 of $109,035.  Because these credits apply to Lisi, as well as to the defendant, the Government will seek to amend the restitution order applicable to Lisi.

restitution order for the full amount of the victim's loss." U.S.S.G. § 5E1.1.  The restitution

figures set forth in the PSR, as amended herein, represent careful consideration of the "full

amount of the victim[s] loss[es]" in this case, including the provision, as appropriate, of "credits

against loss," as described in Application Note 3(E) to U.S.S.G. § 2B1.1.  In her sentencing

submission, the defendant does not take issue with the restitution amounts sought as to Victim-1

and Victims-2 and 3.  (Def. Mem. at 37).  As the defendant suggests in her submission, defense

counsel and the Government have continued to confer as to the restitution amount due to

Victim-4, and the Government believes that the defendant now agrees that the amount set forth

herein—$109,035—is appropriate.

The defendant points to several "[p]otential offsets," essentially suggesting sources of

money from which Victims-2 and 3 *might* recover funds lost in the course of the underlying

fraud.  (Def. Mem. at 37-38).  These recoveries are far from certain and, in the case of the

amount held by the attorney involved in the catering hall property involve a party with ties to the

fraud and relate to lengthy and ongoing civil litigation.  As the Court noted in sentencing Lisi, to

the extent such recoveries do occur, the defendant is free to make an application for those

recoveries to be credited against the restitution amount at the appropriate time.  (Lisi Sent. Tr. at

97-98); see also United States v. Yalincak, No. 05 Cr. 111 (JBA), 2015 U.S. Dist. LEXIS

145153, at * 2-3 (D. Conn. Oct. 26, 2015) (discussing repeated modifications of a restitution

order in light of funds recovered through bankruptcy or related proceedings).

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that a sentence

within the applicable Guidelines range of 27 to 33 months' imprisonment is appropriate in this

case and would be sufficient, but not greater than necessary, to serve the legitimate purposes of

sentencing.[9]

Dated: New York, New York
       February 23, 2018

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney
Southern District of New York

By:       _____/s/_____

Katherine Reilly and Noah Solowiejczyk
Assistant United States Attorneys
(212) 637-6521/2473

---

[9]      The Government has ninety days following the date of sentence to provide the Court with full information concerning the victims and the amount of restitution owed to each of them.  See 18 U.S.C. § 3664.  The Government intends to submit a proposed restitution order shortly, prior to sentencing.  The Government is also preparing a proposed order of forfeiture.