I383ARVS                    Sentence

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                          15 CR 457 (KPF)

KATERINA ARVANITAKIS,

                Defendant.

------------------------------x

                                    New York, N.Y.
                                    March 8, 2018
                                    4:00 p.m.

Before:

                HON. KATHERINE POLK FAILLA,

                                        District Judge

                        APPEARANCES

GEOFFREY S. BERMAN
     Interim United States Attorney for the
     Southern District of New York
KATHERINE C. REILLY
NOAH D. SOLOWIEJCZYK
     Assistant United States Attorneys

JAMES KOUSOUROS
     Attorney for Defendant

ALSO PRESENT:  Special Agent Richard Smythe, FBI

1          THE DEPUTY CLERK:  In the matter of the United States

2   of America v. Katerina Arvanitakis.  Counsel, please identify

3   yourselves for the record.

4          MS. REILLY:  Good afternoon, your Honor.  Katherine

5   Reilly for the government.  With me at counsel table is AUSA

6   Noah Solowiejczyk and Richard Smythe from the FBI.

7          THE COURT:  Thank you.

8          Good afternoon, Mr. Kousouros.

9          MR. KOUSOUROS:  It is just me, Judge.  James

10  Kousouros, 260 Madison Avenue, New York, New York, appearing

11  with Ms. Arvanitakis who is seated to my right, your Honor.

12         THE COURT:  Ms. Arvanitakis, good afternoon to you as

13  well.

14         All right.  Mr. Kousouros, I believe there are members

15  of the family who are here to support Ms. Arvanitakis this

16  afternoon; is that correct?

17         MR. KOUSOUROS:  Your Honor, there are.  Her father is

18  here, her sister and brother are here.  Her husband is here.

19  And Melissa Bondi and Ms. Mamalakis is here.  I don't know her

20  sister's name, but she's here as well.

21         THE COURT:  They're all very much welcome.  I've

22  received letters from several of them in connection with the

23  sentencing and they are useful to me and I thank you, because

24  they allow me to get a more complete picture of

25  Ms. Arvanitakis.  So I thank you for that.

1           Let me also please review what I have to make sure

2    that I have everything that I should.  I have a presentence

3    investigation report, and it is dated September 25 of 2017.  I

4    have a defense sentencing submission that is dated February 16

5    of 2018, and there are exhibits, including letters from friends

6    and reports and other things.  I have a government sentencing

7    submission that is dated February 23 of 2018.  I have victim

8    impact statements that are dated August 14 of 2017, and

9    September 18 of 2017.  I have a government proposed order of

10   restitution, and then I have a consent preliminary order of

11   forfeiture as to specific property, money judgment, that I

12   received a hard copy of this afternoon.

13           Ms. Reilly, should I be directing my questions to you?

14           MS. REILLY:  Yes, your Honor.

15           THE COURT:  Thank you very much.  Is there anything

16   else I should have from the government?

17           MS. REILLY:  No, your Honor.  I don't believe so.

18           THE COURT:  Mr. Kousouros, is there anything else I

19   should have from the defense?

20           MR. KOUSOUROS:  No, your Honor.

21           THE COURT:  Okay.  Mr. Kousouros, while you're

22   standing, let me ask you some housekeeping questions, please.

23           Sir, have you and your client had a sufficient

24   opportunity under Federal Rule of Criminal Procedure 32 to

25   review the presentence investigation report in this case?

1      MR. KOUSOUROS:  We have, your Honor.

2      THE COURT:  Do you have any objections to it, sir?

3      MR. KOUSOUROS:  No.

4      THE COURT:  I understood as well, sir, in your

5  sentencing submission that there was a discussion about

6  possible disputes with the government regarding the restitution

7  or forfeiture figures.  Am I correct that those have been

8  resolved?

9      MR. KOUSOUROS:  You are correct.

10      THE COURT:  Thank you for letting me know.

11      Let me turn to the government.  Ms. Reilly, has the

12  government had a sufficient opportunity under Federal Rule of

13  Criminal Procedure 32 to review the presentence investigation

14  report in this case?

15      MS. REILLY:  Yes, your Honor.

16      THE COURT:  Does the government have any objections to

17  the presentence investigation report?

18      MS. REILLY:  No.

19      THE COURT:  Ms. Reilly, you may have seen yesterday a

20  letter that I received from Ms. Wirth, who is counsel to

21  Mr. Lisi, and perhaps as well you've seen my resolution of

22  that.  Is there any objection from the government to the manner

23  in which I resolved her application?

24      MS. REILLY:  No, your Honor.

25      THE COURT:  Thank you.  Mr. Kousouros, I should have

1   asked you that same question, sir.  Did you see from Ms. Wirth

2   an application for the appointment of additional counsel for

3   Mr. Lisi in this proceeding?

4            MR. KOUSOUROS:  Yes.

5            THE COURT:  Is there any objection from

6   Ms. Arvanitakis to the manner in which I resolved that

7   particular application?

8            MR. KOUSOUROS:  There is not.

9            THE COURT:  Sir, thank you.

10           Ms. Arvanitakis, let me please ask you as well.  Have

11  you had an opportunity to review the presentence investigation

12  report that was prepared in connection with your case?

13           THE DEFENDANT:  Yes, your Honor, I have.

14           THE COURT:  I don't need to know the specifics of your

15  discussions with Mr. Kousouros, but to the extent that you had

16  information that you wanted to communicate to me, were you able

17  to do that?

18           THE DEFENDANT:  Yes, your Honor.

19           THE COURT:  Thank you for letting me know.

20           Let me let the parties know it is my intention to

21  adopt the presentence investigation report in this case, the

22  guidelines calculations that are contained in it, the factual

23  statements that are contained in it.  And I just have a few

24  questions that will aid me in clarifying some lingering issues.

25           Let me please begin with Ms. Reilly.  Ms. Reilly, this

1   was a presentence investigation report that was prepared in

2   September of last year.  It was adjourned for several reasons.

3   Are there updates that should be reflected in the presentence

4   investigation report?

5               MS. REILLY:  Your Honor, I think the only update of

6   which I am aware is to the restitution number, which I've noted

7   in the government's sentencing submission and in the proposed

8   restitution order we've submitted to the Court.

9               THE COURT:  Is it the parties' request that I correct

10  that piece of the presentence report?

11              MS. REILLY:  I think that would make sense, your

12  Honor.

13              THE COURT:  Mr. Kousouros, do you agree?

14              MR. KOUSOUROS:  I do.

15              THE COURT:  Thank you.  Ms. Reilly, just before you

16  sit down.

17              MS. REILLY:  Certainly.

18              THE COURT:  I'd like to understand a little bit more

19  about Ms. Arvanitakis' role and about the manner in which you

20  disagree with the sentencing submission submitted by the

21  defense.

22              Would you prefer to address that later on in

23  connection with your general sentencing presentation?

24              MS. REILLY:  If that is acceptable to your Honor, I

25  think that would make sense.

1        THE COURT:  It is.  Thank you.  May I just ask this,

2   though.  There is an attorney with the last name Haffner who

3   has appeared in documents relating to this case.  I don't know

4   Mr. Haffner.  But it is claimed or it has been represented to

5   me that Mr. Haffner has in his attorney accounts approximately

6   $450,000.  Do you know that to be true or false?

7        MS. REILLY:  Your Honor, I believe that to be the case

8   and I have seen account documents that reflect that amount.

9        THE COURT:  Do you have reason to believe that it

10  belongs to any of the victims in this case?

11        MS. REILLY:  I do, your Honor.

12        THE COURT:  Is there a reason why it has not been

13  released to these victims?  I don't mean to sound glib, I'm

14  trying to figure it out.  Because the last sentence in this

15  case of Mr. Lisi was several months ago, and I believe

16  Mr. Haffner let me know at that time as well that there was

17  money to be had.  I just don't know how to get it to people, if

18  indeed it is appropriately transmitted to people.

19        Do you have any insight on that?

20        MS. REILLY:  My understanding is there is ongoing and

21  at this point fairly protracted civil litigation between the

22  victims and Mr. Haffner to which Ms. Arvanitakis, if not

23  directly a party to the litigation, is certainly involved

24  vis-a-vis a lien on the money in question.

25        The forfeiture order forfeits her interest in that

1   money, and I can tell you it is our intent to work with the

2   Money Laundering and Asset Forfeiture Unit in the U.S.

3   attorney's office to institute proceedings as to the money in

4   that account.

5          THE COURT:  Is there a way in which the consent order

6   that I am currently holding in my hand could be used to obtain

7   that money?

8          MS. REILLY:  I think unfortunately it wouldn't get us

9   all the way there, but would be helpful in resolving at least

10  some of the issues that are pending in the civil litigation.

11         THE COURT:  Ms. Reilly, it is my understanding that

12  two of the victims in this case are present in the courtroom

13  today.  Are there other victims of whom you are aware who are

14  present in the courtroom today?

15         MS. REILLY:  Your Honor, my understanding is that

16  three of the four victims identified in the superseding

17  indictment are here today.  Nadine and Paul Bibbo, and Alex

18  Kopoulos.

19         THE COURT:  Mr. Kopoulos.  Is it the intention of each

20  of these victims to speak as they are entitled to do under the

21  law?

22         MS. REILLY:  That is my understanding, your Honor.  I

23  didn't have an opportunity to personally confer with them, but

24  I believe they all do wish to speak.

25         THE COURT:  I will give them that opportunity if they

1    wish to avail themselves of it.  Thank you for letting me know.

2            Mr. Kousouros, if there is anything that you'd like to

3    say in response to any of the questions I posed to Ms. Reilly,

4    I would be happy to hear from you.  Otherwise I have some

5    questions of my own for you, sir.

6            MR. KOUSOUROS:  Thank you, Judge.

7            Just very briefly, in anticipation and preparation for

8    the sentence, I had a long discussion with Mr. Haffner as well.

9    There have been very long, protracted litigation, it is in a

10   footnote, very briefly until my sentencing memorandum, but here

11   is my understanding.  That the only issue left to be resolved

12   with Mr. Haffner is legal fees that he believes he's owed by

13   the Bibbos.  I think he and, again -- I think -- that he is

14   willing to negotiate that and get rid of the money, get it out

15   of his account.

16           But my understanding is the remaining obstacles --

17   we've never been an obstacle, we've said from the very

18   beginning that the lien that Ms. Arvanitakis has, or at least

19   in my discussions with government while we were negotiating,

20   would be forfeited.  But I think that is the only remaining

21   legal obstacle to the release of that money.

22           THE COURT:  To the extent that Ms. Arvanitakis had or

23   was asserting any lien on any moneys that might otherwise be

24   due to any of the victims in this case, she is foreswearing

25   those now?

1      MR. KOUSOUROS:  It is in the agreement in the

2   forfeiture, and she is, as we stand here before you right now.

3      THE COURT:  Sir, as well there is reference in the

4   presentence report in this case to Ms. Arvanitakis

5   participating in that protracted civil litigation.  Is that

6   correct?

7      MR. KOUSOUROS:  To a certain extent, the protracted

8   litigation I was referring to was the litigation that was going

9   on between the people or the company that had actually bought

10  the property that was involved in the Manor Jax deal I think in

11  a bankruptcy proceeding.  Mr. Haffner informed me, I was not

12  privy to it, he informed me he brought an action to nullify

13  what they said was a lien on the 450 or the 500, which it was

14  originally, and that he was successful in doing that.

15      That was the obstacle that he communicated to me had

16  been lifted, and the only issue remaining had been the legal

17  fees between himself and the Bibbos.

18      To the extent that there was any litigation

19  involvement involving Ms. Arvanitakis, she will exercise

20  whatever steps are necessary to eliminate that, if it hasn't

21  already been eliminated.  I do not believe there is any

22  obstacle, other than the asserted lien by Ms. Arvanitakis to

23  the return of that money to the Bibbos.

24      THE COURT:  Did Ms. Arvanitakis herself bring or join

25  any civil lawsuits against any of the individuals who has been

1    identified as a victim in this case?

2              MR. KOUSOUROS:  Yes.  There has been a lawsuit for

3    legal fees that was instituted by Ms. Arvanitakis, and that is

4    what precipitated the lien.  And Judge, there have been

5    lawsuits going back and forth for a few years here.  They're

6    done.

7              THE COURT:  There is a suggestion in the submissions

8    that I've received that one of those lawsuits was a defamation

9    lawsuit.  Is that correct?

10             MR. KOUSOUROS:  It was.  It was brought some time ago

11   and it was time barred.

12             THE COURT:  Okay.  Time barred.  Was it appropriately

13   brought, sir?

14             MR. KOUSOUROS:  You know, your Honor --

15             THE COURT:  As we're sitting here today in

16   Ms. Arvanitakis' sentencing, should she should have brought a

17   defamation lawsuit against the victims?

18             (Defendant conferring with her counsel)

19             MR. KOUSOUROS:  There were other things said that did

20   not relate to this lawsuit.  As we sit here today, having pled

21   with respect to these allegations, obviously not.  She has

22   pled.  There have been so many things that have been said back

23   and forth between the victims in this case, Ms. Arvanitakis,

24   this bevy of lawyers that was involved in all of the

25   litigation.  So, I don't have it in front of me.

1          Let's just say this:  She truly and fully accepts

2     responsibility for her conduct with respect to these victims

3     here.

4          So to the extent, and I don't know, Judge, I wasn't

5     involved in it, thankfully, no claims regarding what happened

6     here should be the subject of any defamation action.  I just

7     don't know all the other things that were said between the

8     parties that precipitated it, but it wasn't just this.  That's

9     my understanding.

10          THE COURT:  Sir, I am going to change topics, please.

11     At the back of the presentence report in this case, there are

12     conditions of supervised release.  And there are mandatory,

13     which, as you know and I imagine Ms. Arvanitakis can figure

14     out, are ones that I must impose.  There are standard that are

15     always imposed.  And there are several special conditions that

16     are tailored to the facts of this case.

17          Have you reviewed all of these conditions of

18     supervised release with your client?

19          MR. KOUSOUROS:  We have, Judge.

20          THE COURT:  Is there any objection to the suggested

21     special conditions of supervised release?

22          MR. KOUSOUROS:  There is not.

23          THE COURT:  All right.  Thank you for letting me know.

24          Sir, one of the things I guess I'd like to understand.

25     Well, let me ask about Ms. Arvanitakis' family circumstances

1    right now.  Her mom had some health issues.  Are those -- I

2    don't know how those resolved themselves, sir.

3              MR. KOUSOUROS:  They have not resolved themselves and

4    her mom is not here today.  She cannot be here today.  Her

5    mother is dying.  She has many conditions, sepsis, renal

6    failure.  It is in my memo and she really is deteriorating, so

7    her mother is really on her last phase.

8              THE COURT:  Okay.  Ms. Arvanitakis' daughter is doing

9    well?

10             MR. KOUSOUROS:  She's doing well.

11             THE COURT:  Good.

12             MR. KOUSOUROS:  I saw her yesterday.

13             THE COURT:  Okay.  And Ms. Arvanitakis herself, tell

14   me, please, about the status of her health and her mental

15   health.

16             MR. KOUSOUROS:  She's healthy.  Her mental health is

17   improving.  We have submitted in our memorandum which I

18   hopefully will have the opportunity to address later, she's

19   working on her mental health.  She is working on the issues

20   that she's had to deal with over the last several years, and

21   she is coming to grips and understanding the position that she

22   put herself in emotionally and mentally.  But she's on her way.

23             THE COURT:  I wanted to make sure I did not

24   misunderstand the arguments that you are making.  The gentleman

25   with whom she was in a therapeutic relationship became the

1   forensic professional for this sentencing, correct?

2           MR. KOUSOUROS:  That's correct.

3           THE COURT:  And he had been seeing her beginning in or

4   about 2017.  In or about.  I don't know when in 2017.

5           MR. KOUSOUROS:  In August of 2017,

6   Ms. Arvanitakis went to Dr. Meyers to deal with her anxiety and

7   depression.  I can tell you that there had been a steady

8   deterioration in her comportment and she needed help.  And

9   that's why she initially went to see Dr. Meyers.

10          As the therapy continued, as he put in his report, the

11  facts surrounding her relationship with Mr. Lisi began to

12  slowly emerge, and then at some point I had asked him for a

13  mitigation report.  And again, we'll address this later.  It is

14  a report that, quite frankly, not only substantively, but you

15  should rely on because he was very honest in it.  He said at

16  the beginning, because he was treating her, he had to discern

17  whether or not he would be able to do the mitigation report.

18  And when he agreed to do the mitigation report, he stopped

19  treating her, which is appropriate.

20          THE COURT:  Did someone else begin treating her is

21  part of my question.

22          MR. KOUSOUROS:  She has joined several groups, one of

23  which we have -- what is not in our memo but we'll talk about

24  today, and so she is in support groups right now that she is

25  really benefiting from, very much so.

1          THE COURT:  And prior to August of 2017, had she not

2    seen anyone for any mental health issues?

3          MR. KOUSOUROS:  No.

4          THE COURT:  Okay.  Thank you.  I think I do have some

5    other questions for you, sir, but I suspect they are better

6    folded into your presentation.  I imagine I am going to be

7    anticipating things that you are going to tell me anyway, so I

8    don't want to disrupt the flow of that presentation.  And I'll

9    just, if you don't mind when it is your turn to speak, if I

10   could have you just focus on a few areas in the course of many

11   things you will be telling me.

12         MR. KOUSOUROS:  Of course.

13         THE COURT:  I will tell you about them a little bit

14   later.

15         Ms. Reilly, I'd like to hear the government's position

16   with respect to sentencing.  I have read your sentencing

17   submission.  I think I'd like to understand the government's

18   perspective, given everything you've told me, but given as well

19   the sentence that I imposed on Mr. Lisi in this case, so I'll

20   let you begin.

21         MS. REILLY:  Thank you, your Honor.  The government's

22   view is that a guideline sentence here is appropriate.  And I

23   think, as your Honor acknowledged in your earlier question, a

24   lot of the disagreement between the defense's submission and

25   the government's submission relates to precisely what

1    Ms. Arvanitakis' role was and the nature of her culpability.

2              And it is the government's view that

3    Ms. Arvanitakis was properly afforded a minor role reduction in

4    her guidelines calculation.  And I can talk a little bit about

5    the reasons for that, and they're set forth very amply in

6    paragraph 35 of the PSR.  That reduction is reflected in the

7    applicable guidelines range, and we do not think it is

8    appropriate that Ms. Arvanitakis be afforded further leniency

9    on top of that reduction because of her role.  Her role is

10   reflected.  And I want to talk a little bit about what that

11   role was, and then I'll get to your Honor's question if you

12   don't mind about Mr. Lisi's sentence.

13             THE COURT:  Sure, of course.

14             MS. REILLY:  Mr. Lisi, I think it is fair to say, and

15   it is certainly the government's view, directed much of this

16   scheme.  Many of the properties at issue were properties that

17   he had been tied up with in earlier criminal conduct for a

18   number of years.  Many of the misrepresentations made came out

19   of his mouth.  And much of the money, though it flowed through

20   Ms. Arvanitakis, ended up in Mr. Lisi's pocket, or more likely

21   with his creditors.

22             That said, Ms. Arvanitakis was very much a knowing and

23   active participant in this scheme.  We think the facts I just

24   laid out justify a minor participant role adjustment, but do

25   not negate the active role she played.

1       She participated in any number of meetings in which

2  misrepresentations were made to victims and made some of those

3  misrepresentations herself.  She participated very actively in

4  trying to lull victims into a sense of security when they began

5  asking questions about what was happening with their

6  investments and where their money was.

7       And she was in a position, because she is a person of

8  education and of profession, she was an attorney, to know that

9  some of what she was telling them really didn't make sense and

10  wasn't appropriate.

11       And I think that's particularly important when you

12  consider the defendant's argument that deterrence isn't an

13  issue in this sentence, that she'll never do this again.

14  Because this is not a person who walked unknowingly into a bad

15  situation and then got caught up in it.  She is a person who

16  knew very well that the person she was tying herself to in this

17  scheme had been charged criminally, multiple different cases,

18  and had a long history of criminal conduct that related to real

19  estate investments and real estate transactions, and in fact

20  some of these very same properties.  And nevertheless, with

21  that background and that information, she made the choice to

22  continue to engage in this conduct, to continue to be a part of

23  this scheme, even if it was ultimately a scheme of Mr. Lisi's

24  immediate creation.

25       And so the notion that she would never do it again,

1    she would never make a knowing choice to be in this position

2    and therefore doesn't need to be deterred from future criminal

3    conduct, we don't think accurately reflects how she got

4    involved in this scheme to begin with.

5         THE COURT:  How did she get involved in this scheme to

6    begin with?

7         MS. REILLY:  My understanding, and I don't think there

8    is a dispute about this, is that Ms. Arvanitakis worked first

9    as an intern of sorts and then as an associate in the law firm

10   of Dustin Dente.  Mr. Dente was a co-defendant of Mr. Lisi's in

11   his earlier Southern District case.

12        THE COURT:  Is this the one before Judge Buchwald or

13   before Judge Swain?

14        MS. REILLY:  They were ultimately consolidated before

15   Judge Buchwald, but Judge Swain had the original indictment

16   with Mr. Dente.

17        And my understanding is Ms. Arvanitakis developed a

18   professional and personal relationship with Mr. Lisi in that

19   context, and when his criminal troubles came to bear, she had

20   gone out as a solo practitioner and extricated herself from

21   that situation, but essentially invited Mr. Lisi in and he took

22   up residence in her practice and used office space, and much of

23   the scheme was carried out from there.

24        Your Honor, I want to just talk a little bit about --

25   you asked about the disagreement between the government and the

defendant's sentencing submissions.  And I think that

disagreement gets at the core of Ms. Arvanitakis' sense of her

own role and culpability in this scheme.

I take Mr. Kousouros at his word and certainly in the

plea Ms. Arvanitakis accepted responsibility for her conduct.

But I don't think that the defense's sentencing submission

demonstrates remorse or that she has a sense of the real impact

this scheme has had on her victims.

I've cited a number of examples in the government's

sentencing submission at pages 13 to 15.  But to give you just

one, Victim-1 in this case, part of the money that she

purportedly invested was as to a car loan, essentially.  She

was told there was a person who she was essentially issuing a

promissory note to, and that money would be secured by the car.

And Ms. Arvanitakis effectively disclaims any knowledge of that

and says it was orchestrated by Mr. Lisi.  But, it is very

clearly laid out in the PSR that that victim participated in a

meeting where false statements were made to her about that

so-called investment, and Ms. Arvanitakis was an active

participant in that meeting.

And I think what's important about that and about some

of the other examples we've laid out, is a failure to

understand the impact of her actions and her role and her words

on her victims.

And I've talked about this in front of your Honor in

1    connection with Mr. Lisi's sentencing, and the government has

2    set it forth in its brief.  This is a case where the victims

3    very much suffered, not just financially, although the

4    financial damage were significant.  These are people who were

5    tied up in civil litigation, who, though they had money to

6    invest, are not of such substantial resources that were not

7    deeply affected by loss of these funds.

8         THE COURT:  Is it your position that Ms. Arvanitakis

9    was aware that these folks had some money, but perhaps could

10   not withstand the losses they ultimately suffered?

11        MS. REILLY:  Your Honor, I don't know specifically

12   that Ms. Arvanitakis had access to all of their bank accounts

13   or financial statements.  But what I can tell you with

14   confidence, having met with these victims, is that

15   Ms. Arvanitakis and Mr. Lisi developed fairly close personal

16   relationships with these victims, and so certainly had a sense

17   generally of their circumstances.  And used those relationships

18   to help further their scheme and to extract further

19   investments, which of course ultimately went into the accounts

20   and the pockets of Ms. Arvanitakis and her co-defendant.

21        THE COURT:  I know you've read the defense sentencing

22   submission, and I discussed this as well at Mr. Lisi's

23   sentencing.  There is an argument being made here that

24   Ms. Arvanitakis' conduct was the product of what I'll call for

25   short a toxic relationship with Mr. Lisi.  That his conduct

1    towards her -- I'll hear more about it from Mr. Kousouros, but

2    I think the point is it caused her to do things she might not

3    otherwise do with the law degree and the intellect she had.

4           Do you have a position with respect to that?

5           MS. REILLY:  Your Honor, I think the government can't

6    speak to the specifics of their intimate and personal

7    relationship.  We're not in a position to do that.  We don't

8    have the facts behind it.

9           THE COURT:  Okay.

10          MS. REILLY:  I won't presume to.

11          The only thing I would say to your Honor is defendants

12   come before your Honor and in cases that the government brings

13   all the time who have substantially less at their fingertips in

14   terms of resources and support than this defendant had.  And I

15   don't mean to minimize if there was a toxic relationship or

16   abusive relationship, I would never minimize the impact that

17   could have on someone.  I would only suggest it should be

18   considered in conjunction with the supportive family and the

19   education that this defendant brings to the table, and so many

20   others do not.

21          I want to just briefly touch on your Honor's question

22   about Mr. Lisi's sentence as well.

23          THE COURT:  Thank you.

24          MS. REILLY:  I think it is important to remember, and

25   I know your Honor does, that that sentence reflects the fact

1    that Mr. Lisi of course had substantial additional time to

2    serve on his prior sentence as well, and that that factor was

3    discussed and briefed extensively before your Honor.

4          So certainly there is a need, of course, under the

5    relevant statutes to avoid an unwarranted sentencing disparity.

6    But in this case, given Ms. Arvanitakis' role reduction that's

7    already been allotted, we think it adequately reflects her

8    role, and given there isn't the same consideration regarding

9    time that will be served on other charges, the government does

10   think that this guidelines range is appropriate.

11         I am happy to answer any other questions your Honor

12   might have.

13         THE COURT:  No.  Thank you very much.  I think at this

14   time, Mr. Kousouros, you'll tell me if you disagree, I'd like

15   to hear from the victims, and then I'd like to hear from the

16   defense, you and Ms. Arvanitakis.

17         Does that make sense to you, sir?

18         MR. KOUSOUROS:  Of course, your Honor.

19         THE COURT:  Thank you.  Might I perhaps hear from

20   Mr. or Ms. Bibbo if they are in the courtroom.

21         It is Paul Bibbo, sir?

22         MR. BIBBO:  Yes.

23         THE COURT:  Speak slowly, and if you could raise the

24   microphone a little bit, that will aid us all in hearing you.

25   I thank you very much for coming in afternoon.

1          MR. BIBBO:  Your Honor, thank you for allowing me the

2     opportunity to speak.

3          For the past six years, it is as if my wife and I have

4     been fighting for our lives.  The amount of pain and heartache

5     we have endured to get to this point seems almost surreal.

6          Last time at Brandon Lisi's sentencing, listening to

7     him I was shocked at the lack of remorse for his crimes.  It

8     was the one thing I wish I spoke about at his sentencing.

9          Today, with Katerina's sentencing, I hope to see

10     something different.  Knowing that Katerina was trying to call

11     herself a victim pains me, since she's stolen so much of my

12     family's future.  It has been like being victimized all over

13     again.

14          It pains me to sit here.  She has changed our

15     perception of the world.  The financial ruin she has put upon

16     us is something I don't think we can recover from.  The

17     physical toll this has had on my medical conditions has been

18     amplified by this whole ordeal.  So much that I fear years have

19     been taken off my life because of it.

20          Katerina in every way used her influence as an

21     attorney to manipulate us for her own financial benefit.

22     Katerina talked about us not just as clients, but introduced us

23     as her best clients, the Bibbos.  That if she had every client

24     like us, she would be truly blessed.

25          Katerina took the time to introduce us to her family,

 1  and said we were always welcome in her office.  It was that

 2  comfort that she preyed upon.

 3          Katerina was aware of my newly diagnosed illnesses and

 4  our uncertain financial future.  This was her way to steal from

 5  us.

 6          The idea that Brandon had some sort of control over

 7  Katerina is a complete falsehood.  The only thing that Brandon

 8  had an influence on was Katerina's ability to cause a delay.

 9  This ability to delay she learned from Brandon.

10          They were always respectful to each other in our

11  presence, but Katerina called the shots.  She made it clear

12  that her name was the one on the door and this was her office.

13  This was the strength that we leaned on.  Throughout the years

14  in her office, we felt comforted that she was protecting our

15  interests.  In hindsight, this is how she stole from us, by

16  exploiting our needs.

17          In our last meeting with Katerina that took place in

18  her office, she was the only one present.  She called us in on

19  a Sunday afternoon for an emergency meeting.  It turns out this

20  meeting was to sign a charging lien.  As to our surprise,

21  Katerina was different this day.  She threatened Nadine and I

22  in the presence of our 20-month-old daughter that if we didn't

23  sign this charging lien, that we would never seen the $450,000

24  in Steven Haffner's escrow account or the $178,400 we gave to

25  Sam Glass for the Sag Harbor property.

1        When we pushed back at her about the paperwork with

2   regards to the 36th Street property in Astoria, the other

3   moneys we had invested, and the other properties, the countless

4   meetings, the conversations, she said we don't know anything.

5   If we don't sign this charging lien, we're going to have a lot

6   of problems.  This was the last time we spoke with Katerina.

7        This so-called kind, caring attorney turned on us with

8   complete recklessness.  Since then, she has been successful in

9   causing us delays in our civil cases, stopping us from moving

10  forward in every turn.  Katerina went as far as to sue us for

11  defamation of character for going to the authorities for help.

12       In one civil deposition in our case, I sat directly

13  across from Katerina.  She went on and on about how she was to

14  prove her innocence and move on with her life, turning up her

15  nose and steaming mad at every question I answered during that

16  deposition.

17       What she fails to see is the carnage she has left

18  along her path.  My wife and I had to refinance our home

19  numerous times to pay legal expenses.  We have maxed out our

20  credit cards.  I had to cash in a retirement account to cover

21  household expenses.  The amount of mortgage payments we have

22  made would have put both of my children through college.

23       Your Honor, today I come asking you to have Katerina

24  serve out her maximum sentence.  Not only -- not out of

25  revenge, but for the injustice and harm she has caused my

1    family and the other victims, her lack of understanding for the

2    crime she has committed.  With your sentence today, I hope she

3    comes to a place of remorse and understanding for her crimes.

4    And I thank you once again for the opportunity to speak.

5               THE COURT:  Thank you very much, sir.

6               Ms. Lugo, would you like to come forward, please.

7               MS. LUGO BIBBO:  Thank you, your Honor, the Court for

8    allowing me to speak today.  My family and I have suffered for

9    six long years in hopes of finally seeing this day.  Katerina

10   Arvanitakis took advantage of us at our most vulnerable time.

11   From the first time we met with her, she spoke of her successes

12   in court, her abilities as an attorney, and the great

13   opportunities she would present to us.  She used her stature as

14   an attorney and her persona of a strong successful woman to

15   build a relationship with me.

16              The first time I met with Katerina, I was eight

17   months' pregnant.  She knew full well of our family's current

18   situation, of Paul's illness, our struggles to have his

19   disability insurance acknowledge his condition, and the

20   vulnerability I felt being pregnant with our first child while

21   in such financial turmoil.  She used this to her full

22   advantage.  She used our vulnerability to build our trust in

23   her and have us believe in these investment opportunities that

24   were all fraud.

25              Katerina told us over and over again she would protect

us as our attorney, and she was looking out for us in every

way.  When meeting with Katerina and Brandon, Katerina always

seem to be the one in full control.  It was her office that

would protect us, her advice we would listen to, her

representation we trusted.

       The idea that Katerina was a victim too under the

manipulation of Brandon Lisi is not just hard to believe, it is

ridiculous.

       Katerina took special care in developing a bond with

me.  Taking me out for drinks and sharing what I believed to be

personal details of her life with me.  She never exuded

anything but the independent powerful persona that she has

continued to show us during the court battles of the last six

years.

       She may have learned a lot from Brandon, but I cannot

in my wildest dreams imagine she did not fully understand what

she was doing to us and her other victims.  I can't imagine

that any attorney would take a client's money, immediately

convert those funds for their own personal use, and not be

fully cognizant of these criminal actions.

       Katerina looked at us, looked into our eyes on a

nearly daily basis in her office, and hid the truth of her

crimes from us.  Only someone who is truly heartless can take a

vulnerable family's money and look right at them, often with my

newborn daughter in our arms, and just lie.

1      Katerina's actions since 2012 and even since her

2  indictment of 2015 show no remorse or acknowledgment of her

3  crimes.  She has never acknowledged the astronomical amount of

4  money she stole from us, the pain she has caused, and continues

5  to cause us today.  Her incredible delays in our civil cases

6  has caused us additional thousands and thousands of dollars in

7  legal fees, and feels like an open wound that's never allowed

8  to heal.

9      Your Honor, I am a nurse practitioner at Memorial

10 Sloan Kettering Cancer Center.  I work directly with some of

11 our sickest patients, many of whom pass away from their

12 disease.  I have worked with countless families, assisting them

13 through tough situations and oftentimes life-altering

14 treatment.  This is a trauma no family should go through.

15     In a very similar way, I feel that my family is

16 fighting for our lives.  Katerina has taken something from us

17 that we will never get back.  She has taken from us our trust

18 in society and our legal system.

19     We live in constant fear.  Fear of being financially

20 devastated, fear of what the next steps in our legal actions

21 will bring, fear of these criminals and what they will do next.

22 This fear is tangible.  We have put up security cameras in our

23 homes and taken every measure to ensure our safety.

24     Katerina devastated our lives and continues to impact

25 our lives on a daily basis.

1          Your Honor, my hope is that through your sentence

2     today we will finally start our healing process.  We know this

3     ordeal is far from over, but we need a little light at the end

4     of the tunnel.  Our family has suffered for six very long years

5     and has many years ahead of legal battles to close this

6     terrible part of our lives.

7          I only hope today that Katerina is made to serve the

8     sentence that she deserves for the pain she has caused our

9     family and the heartless crimes she's committed.  Thank you.

10          THE COURT:  Thank you very much.  Is it Mr. Kopoulos?

11          MR. KOPOULOS:  Yes.

12          THE COURT:  Do you wish to be heard today?

13          MR. KOPOULOS:  Yes, please.

14          THE COURT:  I'm going to ask you please to come up to

15     the podium.  And sir, you'll excuse me, I am going to ask you

16     please to spell your name when you get up to the podium.  I

17     want to make sure I have the spelling of your name correct.

18          MR. KOPOULOS:  Last name?

19          THE COURT:  Yes, please.

20          MR. KOPOULOS:  K-O-P-O-U-L-O-S.

21          THE COURT:  Thank you.  Okay.  Sir, you've heard the

22     two witnesses speak prior to you.  I am going to ask you to do

23     the same thing.  I want you to speak slower than you think you

24     should be.  Because however slow you are, it is going to be

25     fast.  I am going to ask you just to be careful and speak

1    loudly as well.

2            So at your convenience, I will hear from you.

3            MR. KOPOULOS:  Thank you, your Honor.  I don't have a

4    statement prepared like them, but I just have little bullet

5    points.

6            And I was sitting in the back there and I was

7    listening to her attorney say, you know, how remorseful and

8    stuff she was.  And I'm also in civil litigation with her, and

9    she saw my attorney and she said she would fight me tooth and

10   nail until the very end.  She's not remorseful.  She told my

11   attorney that she's not going to jail and she's going to

12   Greece.

13           THE COURT:  Sir, when did that conversation take

14   place, if you can recall?

15           MR. KOPOULOS:  I don't remember the exact court date.

16   But I did have a conversation with Agent Smythe to let him know

17   that she said that -- that she said that to my attorney at the

18   time.

19           THE COURT:  Do you understand that conversation to

20   have taken place in calendar year 2017?

21           MR. KOPOULOS:  Yes, yes, it was 2017, correct.

22           THE COURT:  The year that has just ended.

23           MR. KOPOULOS:  Yes.

24           THE COURT:  Thank you for letting me know.

25           MR. KOPOULOS:  Now I am going to backtrack forward.

1    Same thing that she said that she was a victim to Brandon.

2    Absolutely not.  She knew exactly what was going on.

3         I was involved in a very bad car accident

4    September 15, 2012.  I was in the hospital in bed on morphine

5    when she, Katerina and Brandon Lisi both came to the hospital,

6    made me sign a retainer, okay, and then made me give them

7    $120,000 to put in their account so they could hide it from my

8    cousin.  Because she was telling me my cousin was suing me and

9    they need to hide the money.  She's --

10        THE COURT:  Sir, does your cousin have a name?

11        MR. KOPOULOS:  Sue Sodonis.

12        THE COURT:  Were you in fact in -- is it Ms. Sodonis,

13   sir?

14        MR. KOPOULOS:  Mrs.

15        THE COURT:  Were you in fact in a dispute with Mrs.

16   Sodonis at the time you signed this agreement?

17        MR. KOPOULOS:  I was.  I was.

18        THE COURT:  Okay.

19        MR. KOPOULOS:  And then, after that my aunt passed

20   away.  She was even at my aunt's deathbed.  And she knew that

21   she had left me money.  And one time we even had a conversation

22   in her office, and she turned around and she said to me that my

23   inheritance was more important to her than it is actually to

24   me.

25        She did the same thing to us.  She befriended us.  She

1    came into my house.  Countless times she would come into my

2    house and she would say if the FBI agents come to your house

3    and ask you any questions, you are not to speak to them.  You

4    are to call this attorney.  She would tell us.

5         So, after my aunt passed away and the money was all

6    held up in litigation and stuff, I finally got the money, and I

7    kept asking her for a bill for about 10 months.  Finally she

8    gives me a bill, and it was for $180,000.  I kept asking her

9    how much the bill was.  She would tell me don't worry about it,

10   we're friends.  Don't worry about it.  So that's when I filed

11   the civil lawsuit against her.  And she sat there with a smile

12   on the face telling, me she deserved that $180,000.

13        At the time also, we were going to fix our house.  I

14   went to an architect.  I made plans because we were going to

15   get this money and we were going to fix this house.

16        THE COURT:  The money that you were getting?

17        MR. KOPOULOS:  From the inheritance.  Well, that

18   didn't happen.  So then after that, my kids and my wife turned

19   around and looked at me and said to me what is the matter with

20   you giving her all that money.

21        It makes me angry to stand here and to hear her

22   attorney say that she is remorseful.  She is now a mother that

23   she had told my wife in a conversation that she never wanted to

24   have kids.  She's doing this as a ploy so everybody can feel

25   sorry for her.

1          I'm now 457 days sober because I tried taking my life

2     because of what she did to me, because my wife filed for a

3     divorce.  My kids didn't want to speak to me because they

4     blamed everything on me.  So now that she is a mother, she'll

5     understand one day if somebody steals from her kids, or kid,

6     and see how she feels about it.

7          THE COURT:  Sir, I don't want to put salt in an open

8     wound.  What is the status of the proceedings with your wife?

9     Have you reconciled or not?

10         MR. KOPOULOS:  It is still day to day, and there's

11    still things that are being back and forth.  But at least now

12    I, I speak with my kids.  But, you know, with my wife still, it

13    is an open wound.  That was her dream.  That was her dream.

14         THE COURT:  Your wife's dream to fix the house.

15         MR. KOPOULOS:  To fix the house.  I wanted a nice

16    house for my kids, I wanted, you know, and she ripped that away

17    from us.  And she constantly would tell me, you know, to put

18    $30,000 in an escrow account for a BMW that supposedly I was

19    buying because Paul Bibbo had -- there was always, always a

20    lie.  She knew exactly what she was doing.

21         And again, in my recovery, step 9 is to make amends

22    with the people that you've hurt.  And I still have not seen

23    amends and I have not seen any remorse from her at all, zero.

24         That's it.  I can't talk anymore because it is just,

25    it's just really painful to sit up here, and like they said,

1    she put me in a financial devastation.  She said things to me

2    that were, I mean, just totally out of the -- like, an attorney

3    would never say to a client.  And it's just, again, I'm really

4    disgusted, and I would ask you to also give her the maximum

5    sentence that you possibly can.  And not for revenge.  But so

6    she can learn a lesson.

7                THE COURT:  Thank you very much for speaking this

8    afternoon, sir.

9                MR. KOPOULOS:  Thank you.

10                THE COURT:  Thank you.

11                Mr. Kousouros, I'd like to hear from you as well, sir.

12    You can take a few moments if you need to because you may want

13    to process some of the things you heard this afternoon, but I'd

14    also like to understand this.

15                As I read the sentencing submission, I understand the

16    concept of explaining and providing context for things, but

17    there does seem to be a fair amount of shifting of blame either

18    to Mr. Zelin or Mr. Dente or Mr. Lisi or to the victims in this

19    case.  I am sure you don't mean to do that, but I want to

20    understand that a little bit more.  And I guess that's really

21    the biggest issue that I have with the sentencing submission.

22    I do want to understand what happened and what brought us to

23    the position we are right now.  But, it can't be -- or maybe it

24    can be.

25                Is there the argument that these victims were simply

1    greedy or that this was entirely Mr. Lisi's doing or that these

2    victims, the people I've just heard from today, knew what they

3    were doing?

4            Additionally, it's my understanding that at the time

5    these events were taking place, Ms. Arvanitakis was aware that

6    Mr. Dente and Mr. Lisi were under indictment.

7            If I'm mistaken, you'll let me know.  But if that is

8    the case, I do want to understand what steps she took to make

9    sure -- just to protect herself as well as her clients, knowing

10   that these folks were under indictment for crimes very similar

11   to what brings us here today.

12           So I know that's quite a big windup, sir, but I want

13   to hear from you anything you want to tell me.

14           MR. KOUSOUROS:  Would you mind if I brought the podium

15   here?

16           THE COURT:  Is it easier for you to bring the

17   documents there?

18           MR. KOUSOUROS:  No.

19           THE COURT:  Make sure one of the microphones joins you

20   at the podium.  I want to make sure we all hear you.

21           Sir, would that podium work better?

22           MR. KOUSOUROS:  I think you've got it, Judge.

23           THE COURT:  Great.

24           MR. KOUSOUROS:  I'll tell you what.  I'm sure you will

25   be able to hear me.

1          THE COURT:  The court reporter and I cannot hear you.

2     So you'll do it from wherever you are.  Okay.

3          MR. KOUSOUROS:  I'll lean on it this way.

4          THE COURT:  Fine.

5          MR. KOUSOUROS:  So, I usually don't like to start

6     backwards and going forwards, but I do have to address just

7     some of these issues.

8          THE COURT:  Please do.

9          MR. KOUSOUROS:  Mr. Kopoulos hired Ms. Arvanitakis,

10    was given a choice between a contingency fee and an hourly fee.

11    She resolved the case favorably for upwards of $700,000.  In

12    2013, he got over $500,000.  And she's being sued for the

13    hourly bill that she gave him, and she will defend that work

14    because it went for quite some time.

15         So, the notion that he couldn't fix his house, get his

16    money, I don't know where that comes from.  But, the case was

17    resolved favorably, he got his money.  That's not the

18    victimization we have here, which we'll address separately.

19         THE COURT:  What is the basis for the restitution

20    figure of $109,035 to him?

21         MR. KOUSOUROS:  It is 130,000 he put into Tyche which

22    we acknowledge.  Just this notion that she took his money from

23    the lawsuit, we do challenge that.

24         THE COURT:  Okay.

25         MR. KOUSOUROS:  Interestingly, Mr. Kopoulos's drove

1    Mr. Lisi to prison after you sentenced him.  And this

2    relationship, I never quite understood.  This is --

3            THE COURT:  Sir, I'm perplexed because Mr. Lisi came

4    to me courtesy of the bureau of prisons.  He was serving a term

5    in Fort Dix.  And he was brought here on writ and left here on

6    writ.  I didn't -- unless the bureau of prisons is farming out

7    their transit system, I don't think he did that.

8            MR. KOUSOUROS:  When Judge Buchwald.  I may have

9    misspoken.

10           THE COURT:  You certainly did.

11           MR. KOUSOUROS:  Sorry.

12           THE COURT:  That's many years earlier.

13           MR. KOUSOUROS:  In 2014, and that relationship

14   continued until that soured.

15           So Judge, one of the issues in terms of the

16   disagreement that we've had in our sentencing submissions is I

17   didn't want to go there.  Okay.  The reality is this:

18   Ms. Arvanitakis is remorseful.  And she does accept

19   responsibility for her conduct.  And I will, with your

20   permission and patience, talk about it.

21           What we're trying to do is present an accurate

22   landscape of just what her role was.  It is interesting that

23   after I filed my sentencing memorandum, I get an amended victim

24   impact statement from the Bibbos, and I suppose it's going to

25   be for this Honorable Court to figure out who is telling the

1    truth about what brought Ms. Arvanitakis here, and that is what

2    I want to address.

3          But in terms of your question, if you got any sense

4    whatsoever that our sentencing submission was painting the

5    victims out to be greedy --

6          THE COURT:  Yes.

7          MR. KOUSOUROS:  That is not our intention.

8          THE COURT:  For example, there is a substantial

9    footnote about the prowess of Mr. Bibbo with respect to real

10   estate investments.  And I don't know, I'm not sure, one could

11   be sophisticated and one can have knowledge of real estate

12   investments and still be deceived.  So I'm trying to figure out

13   where you are going with footnotes of that type.

14         MR. KOUSOUROS:  I am going exactly where you just

15   went.  That's what happened.  The reason for that footnote, and

16   actually, Judge, it is in my presentation and you'll see, but

17   in short, it is what kind of puzzled me about this case from

18   the beginning, and I spoke to the government about it which

19   they very courteously met with me and exchanged a lot of

20   information.

21         The point there was this:  That these investments,

22   when they started, they did make sense.  They did.  And they

23   were viable.  You know, in 32 years I've represented people in

24   the securities industry, in the mortgage industry, in the real

25   estate industry, and you know, I'll get to this in a minute,

1    but normally they are they're frauds ab initio, We're going to

2    collect money from people, we are going to lie to them about

3    where it's going, and I am going to take money from people to

4    invest in stocks and I'm going to buy a yacht.

5           What was strange about this case, just different about

6    this case, was how it did evolve.  That footnote only was to

7    point out that certainly the Bibbos, not Laurie-Ann Stein, they

8    were familiar with real estate transactions and the notion of

9    distressed debt was, quite frankly, I had to educate myself in

10   defending this case.  So, that was the only point there.  Okay.

11          THE COURT:  Okay.

12          MR. KOUSOUROS:  Initially, the way Lisi pitched it,

13   they did make sense.  And actually, theoretically, they were

14   viable and potentially profitable for the investors while at

15   the same time allowing Lisi in purchasing the distressed debt

16   to make his victims whole from the other case.  But, we'll get

17   there.

18          So, there are some things that are not disputed here.

19   In 2006 or thereabouts Ms. Arvanitakis graduated from law

20   school, and within a couple of years was admitted to practice

21   law in four states.  There is really no dispute that this was a

22   lifelong dream of hers and her parents, who spent their lives

23   selling hot dogs in the street or in other businesses in order

24   to take care of her.

25          There is no evidence, and there can be no evidence to

even suggest that there was even a hint of criminality in her

bones.  When she walked out of that law school, she had never

been arrested, she had never been in trouble, she was a good

person, she sits next to me right now she is a good person.

That's where we started.  That's who graduated from law school.

So, when she got an externship with Mr. Dente, she

started learning about closings and foreclosures, and after she

passed the bar, she didn't want to stay there because she

wanted to be a litigator.  And Mr. Dente had really no interest

or desire to see the four walls of a courtroom.

But the financial crisis struck, she had nowhere to

go, he offered her a job, she took the job.  Again, at that

point she knows nothing about any criminality, and all she

wants to do is become a lawyer, take care of herself, and take

care of her parents.

She met Brandon Lisi some time after that.  And

unbeknownst to her, at that time, your Honor, both of these men

were criminals.  They were fraudsters.  They were manipulators.

From as early as 2007 they're committing mortgage fraud, using

straw buyers to purchase properties, refinancing them, keeping

the money, and demolishing their credit.  And they both came

onto her.

She played no role whatsoever in their crimes.  What

she was doing was working day and night on files and hopefully

being able to establish her own practice.  By the time they

1  were both indicted, she's working without pay.  Dente at some

2  point closes the office.  But for months before that is paying

3  nobody, not paying any bills.  So when he walks away, Lisi

4  takes over.

5           THE COURT:  Lisi takes over.

6           MR. KOUSOUROS:  Lisi takes over his office.

7           THE COURT:  Why did she stay if she was going months

8  without pay?

9           MR. KOUSOUROS:  Because at that time, she didn't have

10  a job, Dente had walked away, she had established a

11  relationship with his clients, and so, she was going to take

12  over his files.  And at that time, with no work elsewhere and

13  having kind of established a niche in the foreclosure industry.

14  The foreclosure industry at that time was proliferating.  As

15  you know, the 2008 crisis hits and there are foreclosures that

16  are going through the roof.  It was an opportunity for her.

17           You know something, at the end of the day, whether

18  anybody believes it or not, she had fallen for this guy.  And

19  Lisi had told her take the files, she borrowed $35,000 from her

20  father to pay the bills from the office, then another $20,000

21  to pay Lisi's taxes for some property in Long Island.  And yes,

22  she did keep him there because she had fallen for him.  And I'm

23  going to get to and I will prove to you, I think, that this is

24  true.

25           Nothing I say here excuses her behavior.  Nothing.

1    And she knows that and she'll tell you that.  And it's true.

2    But the fact of the matter is that understanding where somebody

3    is before they get involved in criminal activity is important,

4    because you have to think about, well, what's that person's

5    motivation.  What inclinations did they have.  Where was that

6    person before.  Where would Katerina Arvanitakis be right now

7    if she had not met this man.  She would be in an office working

8    legitimately, and there isn't an ounce, a scintilla of evidence

9    in her life, in the people that know her, to suggest otherwise.

10    And so when Dr. Meyers does say that being a victim of

11    domestic abuse and defining it for what it is, that she would

12    certainly not likely have committed any of these crimes had she

13    not met him, it is true.

14    So what happens after that is important, Judge, and

15    this goes to one of your questions.  After Lisi's indicted on

16    both cases, they're together, and she is dependent on him in

17    many ways.  And you know something, some of the things that the

18    Bibbos and Mr. Kopoulos said, you know, they don't necessarily

19    negate this.

20    And I'll also tell you that, you know, in the past few

21    years, my wife is the president of the board of directors of a

22    domestic violence organization up in Westchester.  And I will

23    tell you that it has been an amazing education for me.  Because

24    you know something, strong women, professional women, women

25    that you would look at in their everyday lives and say, man,

1    what a powerhouse, are victims.

2            So the simple comportment of an individual during

3    certain times does not negate the fact that they can still be

4    victimized, and that's just the truth.

5            So, you know, yes, Katerina can be aggressive and she

6    can speak aggressively.  There is no question about that.  But

7    it does not negate the true landscape of just where she is in

8    this entire affair.

9            Lisi needs to mitigate his losses.  Now is that true?

10   Does that make sense?  I don't know.

11           THE COURT:  What this is that?

12           MR. KOUSOUROS:  Whether or not that he could have

13   mitigated his losses.  But we know from the transcript from the

14   Judge Buchwald hearing, and we know from the civil transcript

15   that Mr. Zelin went into -- I'm not blaming them.  What I'm

16   simply saying, and I think I am going to hit your points,

17   you'll want me to sit down.

18           THE COURT:  Not at all.

19           MR. KOUSOUROS:  Thank you.  What I'm saying is that's

20   where he got the idea.  He had lawyers, he had a lawyer telling

21   him, listen, you've got this 2B1.1 enhancement, it is a lot of

22   money.  If you can figure out a way to mitigate it.  It was

23   probably okay advice, as long as you don't break the law doing

24   it.

25           THE COURT:  That's the big asterisk.

1          MR. KOUSOUROS:  The little footnote there.  My point

2   though, and the reason it is in my memo, is that's what he was

3   trying to do.  And so what he did was he devised these

4   transactions, and, Judge, Judge Failla, he devised these

5   transactions.  I mean, a lot of what I am simply saying here is

6   she's not the architect of this.

7          She readily admits, readily acknowledged that there

8   was a point where she did join in the fraud when it started,

9   but she's not the architect of this.  So, I'm not going to be

10  long on this, because there is no reason for it.  But he

11  devised these transactions.

12         Essentially what he's done, he's made a mess of these

13  properties from a debt standpoint.  He's taken out hard money

14  loans, people have lost money, they're victimized, so here's

15  his thing.  The real estate market is in tatters, here's what

16  we are going to do. We are going to get investors, they're

17  going to invest some money, we are going to buy the distressed

18  debt because banks are taking less on the debt.  We are going

19  to own the property at good prices, and then we'll be able to

20  sell them.  My victims will be compensated and the investors

21  will make some dough.  That is his plan.  And, I don't think

22  the government disagrees, it is a viable plan.

23         So he presents it to the Bibbos, and my only point is

24  that Mr. Bibbo did have some real estate experience, so it

25  would be something that he'd understand, and can't blame him

1   for saying it's not a bad idea, let's give it a shot.  So,

2   that's what happens.

3            Sag Harbor is a very famous property, it actually sold

4   for a lot of money a couple of years ago.  Cold Spring Harbor

5   as well.  They were viable.

6            So, this is the way this starts.  And she's there for

7   it.  And she's with this man.  And she doesn't want him to go

8   to prison because she's falling in love with him and he is

9   controlling, but it's okay at the time.

10            So, here's this great plan where he is going to

11   mitigate his losses, hopefully not go to prison for a long

12   time, and all is well.  That's the way this started.

13            We also presented to you some information about how

14   everybody met.  And that's also important because the

15   government's memo seems to suggest that they are just walking

16   around trolling for victims.  And that's not what happened.

17   And we've laid out for you how they met the Bibbos.  They were

18   retained on this case when they met Laurie-Ann Stein.

19   Laurie-Ann Stein and the Bibbos didn't get presented with these

20   investments until several months later.  They weren't just

21   trolling around for investors.

22            Now, does it surprise me at all that Lisi, present for

23   these meetings, sees dollar signs in his eyes in terms of these

24   investments which may make sense?  No.  But in terms of

25   Ms. Arvanitakis, she's in her office, she's working.  The

1    Bibbos come in, they're referred by somebody on a civil matter,

2    she takes their case.  Laurie-Ann Stein was also referred on

3    civil matters, she took her cases, and this is well before any

4    of the transactions begin.

5        The fraud happens, begins when deals go south because

6    the debt could not be purchased at fire sale prices.  And then

7    what happens is, Judge, I have yet to see in all my time a

8    series of maneuvers, I mean, bankruptcies and just one thing

9    after another, bringing one lawyer in, another lawyer in, that

10   is not Ms. Arvanitakis's doing.  I believe, and I'll point it

11   out to you, I believe that the Bibbos at the sentencing of

12   Mr. Lisi made it very clear it was Lisi who brought in these

13   other lawyers.  But this is where she falls, and there is no

14   question about it and nobody is denying it.

15       At this time, it's clear these deals are not working.

16   And that Lisi is constructing one after another after another

17   transaction, and these people were lied to and

18   Ms. Arvanitakis is right there, and yes, she's joining in the

19   misrepresentations, and it is for this that she knows she has

20   to atone.  It was page 69 of the sentencing for Mr. Lisi.

21       So, what's going on during this time?  Well, I ask you

22   to consider this.  Because again, when you think of these Ponzi

23   schemes, you think of these frauds in which people are

24   victimized.  Why do people do that?  They do it for money.

25   They do it to make money, they do it to buy houses, to buy

yachts, or on a smaller scale, to buy things.  To enrich

themselves.  In this case, there was nothing monetary in it for

her.  Nothing.  She is --

THE COURT:  I thought, I thought I understood from the

government's submission that certain of her outstanding bills

were being paid by some of the money that was received.

MR. KOUSOUROS:  Exactly.

THE COURT:  So isn't that money in it for her?

MR. KOUSOUROS:  Well, when it starts, what I'm talking

about is motivation for the fraud.  What's happening, you're

taking the sentences right out of my mouth.

THE COURT:  I'll let you speak then.

MR. KOUSOUROS:  No, it's great.  It's working.  What's

happening is she's operating her practice and she's working.

Working hard.  She's making money.  Lisi is taking it.

And you have the letter from Melissa Bondi.  I have to

tell you, I've got, I got a list of expenses, $42,000 just in

health insurance for him and his mother.  Cars.  He's calling

Melissa Bondi, is there any money in the account because he's

on house arrest.  He's draining her account, and yes,

ultimately, money did -- ultimately, money did go because every

balance she had was negative.  He borrowed $260,000 on one of

the deals, tells her to pay it.  I've got 41,000, 53,000 on

bank statements that are coming out.  She doesn't have $53,000

bills.

 1          Ultimately, did some of that money go to keep her

 2    afloat, yes.  But what I'm talking about is why do people

 3    commit fraud.  They don't commit fraud because this guy will

 4    empty my account and somehow I am going to try to divert some

 5    money to pay it.  There was nothing monetary in it for her.  It

 6    wasn't like let's defraud these people, let's take their money,

 7    let's not invest in the properties, and run off to Greece or

 8    wherever.  There was nothing monetary in it for her.  So that's

 9    important.  Again, 43,000 on health insurance, tens of

10    thousands of dollars in American Express bills for him and his

11    mother, and again, Melissa gave you the letter.  She wasn't

12    taking money to buy things.  She wasn't taking for money for

13    any other reason except to keep her balances afloat.

14          As the government and the probation report has agreed,

15    most of the money went to pay for Lisi's bills.  I think that's

16    important.  Because again, you have to think of what is

17    somebody's motivation to commit a fraud.

18          And so, at the end of the day, the inescapable

19    conclusion is that the only thing she had to gain from this was

20    Brandon Lisi.  That's why she was doing it, that's why when the

21    deals went south, she didn't stand up as she should have and

22    said are you crazy?  I'm out of this.  Because she loved him,

23    he did control her, and he was all she had to gain.  That's

24    what she had to gain from this.  That was her benefit.

25          You talked about the victim impact statements, and you

1    want to know something, I don't blame them for being angry.

2    And you know something, they have suffered.

3    Ms. Arvanitakis knows they have suffered.

4            There has been yelling back and forth, they were

5    taping each other's conversations, this has been a soap opera,

6    a very sad one, and a tragedy.  And it is a tragedy for these

7    victims, but I will tell you this.  I'm asking you, please, you

8    have far more experience than I do listening to this.  Bear in

9    mind, if you would, respectfully, that sometimes anger does

10   prevent some of the truth from coming out, and it's truth that

11   doesn't hurt their cause.

12           Let me give you an example.  The Bibbos know that Lisi

13   was driving this train.  They know that he was the one with the

14   details.  You heard about a conversation in August 2012, this

15   is when the lease -- the Bibbos went to Ms. Arvanitakis'

16   office, and I assure you, I assure you they asked where is

17   Brandon a solid 10 times during that conversation.

18           They were discussing these $7,200 payments that

19   Ms. Arvanitakis was making to help pay their mortgage on the

20   Manor Jax deal, and they acknowledged several times Brandon

21   promised us, Brandon promised us, Brandon said he was going to

22   pay the 7,200.

23           She wound up paying $51,800, which is Exhibit J from

24   our memorandum, from her operating account, from her business

25   account.  And they kept saying to her, no, you have to get this

1  money back.  You should get a credit.  But you should only get

2  a credit for the 3,600, not the 7,200, because that was money

3  Brandon should have paid.

4        Now, please, let me be clear.  I am not saying and

5  I've agreed with the government on restitution in terms of what

6  credit they should get or not.  I fully understand that that

7  was money that the Bibbos needed to service the debt because

8  they borrowed money in order to make the investment.  That's

9  not the point I'm making.

10       What I am saying to you is that they know who was

11  making the misrepresentations to them for the most part.  They

12  know who was making the promises to them, and they know that

13  Katerina Arvanitakis was victimized by this man, at least, at

14  least to the extent that she's paying out of her operating

15  account money that he promised them.

16       They also know, I'm sorry to say, contrary to the

17  statements made, that Lisi was abusive.  They were in that

18  office I can't tell you how many times, according to Melissa,

19  according to other witnesses, how many times listening to Lisi

20  yelling at Ms. Arvanitakis and calling her an idiot in the

21  conference room, coming in and talking to them and then going

22  back and then coming in.  I mean, this is the truth.  It

23  doesn't hurt their cause.  It doesn't make them less victims,

24  it doesn't make her less guilty.  It doesn't detract from her

25  acceptance of responsibility.  But I do think, my job, to the

1    best of my ability, is to paint the right landscape, a true

2    landscape, because that's who you're sentencing today.

3            Laurie-Ann Stein knows, and this is really important,

4    because you've heard a lot of people talk about how my client

5    was not in any way victimized.  Laurie-Ann Stein knows where

6    Katerina Arvanitakis was, because she knows that Brandon Lisi

7    played her.  She knows that she was drawn to him.  I've heard

8    other witnesses tell me the way he manipulated her, she knows

9    Katerina did not play a role in those legal fees which we all

10   agree.  And she knows that Lisi was driving this train.

11           But here's an issue that, I have to tell you, I'm

12   reading last night everything I could possibly read.  There is

13   an issue with Laurie-Ann Stein that is revelatory to this

14   Court, because it not only illustrates, as the government made

15   clear in the Lisi sentencing, his disrespect for the Court.  I

16   have to tell you, most respectfully, I think they missed the

17   point.  It shows his manipulation of the women around him.  He

18   made this poor woman walk into a bankruptcy court and commit

19   fraud and commit a crime.

20           It wasn't enough that he took her $150,000.  It wasn't

21   enough that he took his 30,000.  It wasn't enough that he took

22   her $100,000 and put it into a deal.  You know what happened

23   was the first time he had $150,000 of Laurie-Ann Stein's money,

24   it went into a deal precipitorily because they bought the

25   second before they bought the first and then the deal went

1    south.  That wasn't enough.  He then took this young lady, who

2    liked him, had her walk into a court and commit a crime.

3           So, really, are we going to contest that this is not

4    an individual who is manipulative and took advantage of the

5    women around him?  That's disgusting, but it is revelatory.  As

6    I said, the government discussed that with respect to his

7    respect for the Court.  Again, I think our point is clearer.

8    The point in our sentencing submission is that Brandon Lisi was

9    driving this, and even as the government stated at page 114 of

10   the Lisi sentencing, he was the driver of the conduct, which I

11   don't think that they take back today.

12          I need to speak to you very briefly, and I know I'm

13   going on for a while.

14          THE COURT:  Sir, take the time that you need to take.

15          MR. KOUSOUROS:  The government -- thank you very much.

16   The government discussed a minor role.  And again, I have

17   nothing but respect for our colleagues, they gave us a lot of

18   time here, there was a lot of discovery.  We met with them and

19   exchanged information, and we were able to convince them, and I

20   think they convinced themselves that she was entitled to a

21   minor role.

22          Judge Failla, you know this.  This is not some plea

23   bargain in the process.  Not in this district.  These

24   adjustments are fact based.  Nobody is going to come before

25   this Court, and again, I read the Lisi transcript and I happen

to know now that I read everything.  And nobody is coming

before you with an unsubstantiated and unwarranted minor role

as though you're just going to rubber stamp it because it's in

the plea agreement.  We have to earn those.  We have to prove

that they're fact based.  And yet, the government seems to

suggest, and I hear this a lot.  This is where I part ways.

The government seems to suggest, Judge Failla, we gave her a

minor role.  We gave her the break.  She is not entitled to

anything more.  And that, I submit to you respectfully, is

contrary to 18 U.S.C. 3553, and the Supreme Court's dictate

that that statute be considered once the guidelines are

established.

          The minor role in this case, Judge Failla, does

nothing more than put Ms. Arvanitakis in a guideline range to

which she is entitled.  It is not a substitute for 3553, it is

not preclusive in any way, shape or form from this Court

saying, you know something, I have to consider the guidelines,

these are your guidelines, now let me look at the other

factors.  That's why these guidelines are advisory.  Because

they attach relevant numbers to conduct.  They are numbers that

apply differently to different people, and you're sentencing a

human being.

          I quote some cases in my memorandum which I have come

to admire very much.  Not only for their wonderful prose, but

for their wisdom.  And what I didn't put in there was a quote

1   from United States v. Adelson, which is 441 F. Supp. 2d 506,

2   where the Second Circuit described, "The utter travesty of

3   justice that sometimes results from the guidelines fetish with

4   abstract arithmetic as well as the harm that guideline

5   calculations can visit on human beings if not cabined by common

6   sense."

7           I'm not saying that the guidelines in this case are a

8   travesty.  I'm not saying that they're not representative of

9   the arithmetic calculations that the commission has decided to

10  attach to conduct.  What I am saying is that if you think about

11  United States v. Jones, and you talk about and think about the

12  individual assessment, and this is one that will stick with me

13  forever because it gives meaning to what I do and I think what

14  we all do, that every person can be considered an individual,

15  and every case has a unique study in human failings that

16  sometimes mitigate, sometimes magnify the crime of punishment

17  to ensue.  That breathes life into your discretion and your

18  evaluation of who this person is.

19          I do not believe, most respectfully, Judge, that there

20  are magnifying issues here.  But I do believe that there is, if

21  you can call it a human failing, in becoming subject to

22  somebody else and changing who you are because of that as a

23  human failing, I think it exists here.

24          Ms. Arvanitakis fell in love with this man and he was

25  a textbook abuser.  He was charismatic, he was bright, he was

kind and loving in some ways, and he was verbally and at times

physically abusive, and oh, and he was an alcoholic.  I'm

sorry.  Was he?  There is just another example because I need

to convince you, I hope to convince you, that he is what we say

he is and what Ms. Arvanitakis says he is.

I read the sentencing minutes from Judge Buchwald

again for the tenth time last night.  And then I read the

sentencing minutes before your Honor.  Not one word before

Judge Buchwald about addiction or alcoholism, you know, that

longstanding addictive personality he spoke to you about that

he's been fighting his demons for years and that he was such a

bad alcoholic.

THE COURT:  I'm familiar with it.

MR. KOUSOUROS:  You remember that.  Not a word about

these demons before Judge Buchwald.

I have a four letter word for that.  RDAP.  And then

Judge Buchwald, who I've practiced before and I feel like my

whole life as I get older and older says what?  My 34 years on

the federal bench, I have never had a defendant endeavor to

manipulate the Court as you have.  I think he did it again.  As

I said, I've been before Judge Buchwald so many times, this is

one of the most compassionate people I've ever stood before,

I've ever had the honor of standing before.  Let me tell you,

it takes a lot to render a statement like that from Judge

Buchwald.

1      So aside from what he tells this Court, aside from the

2 fact that he manipulates a young lady who he has victimized

3 into going into court and committing a federal crime, I think

4 you can believe the evidence before you, notwithstanding the

5 statements you just heard, that my client was absolutely a

6 victim of intimate partner abuse which we used to call battered

7 women syndrome.

8      How do we know, aside from just this?  You've read the

9 letters from Melissa Bondi, you've read the letter from Angie

10 Mamalakis, you've read her father's letter.  They witnessed the

11 verbal abuse.  Melissa was responsible for the checkbook.  Lisi

12 would constantly call her and tell her to transfer money to

13 him.  When she protested, she bore the brunt of his temper.  It

14 was Melissa that drove Ms. Arvanitakis to the hospital after

15 Lisi dragged her on the floor, she hit her head on his mother's

16 metal hospital bed, ran outside, got in her car, couldn't see,

17 called her sister, her sister called Melissa, and while she sat

18 there, Melissa came and got her and took her to the hospital,

19 and you have a hospital record.  We are not making it up.

20      Then you have a forensic report from Dr. Meyers.  I

21 never met him, by the way, before this.  I didn't refer him to

22 Ms. Arvanitakis.  In my view it is a trustworthy report.  He

23 makes it clear that Ms. Arvanitakis knew and has acknowledged

24 what she did was wrong, based on objective tests, along with

25 interviews, he concludes that she was a victim of intimate

1    partner abuse.  And that as a result of it -- this is

2    important -- she was subservient to Lisi.  That's different

3    from a minor role.  This is consistent with the evidence in

4    this case.

5           As Dr. Meyers reports and as I've learned, more than

6    22 percent of women in the United States have been victims of

7    bartered women syndrome, and that this also explains some of

8    her conduct that, among other psychological effects, is denial,

9    confusion, numbing, fear, loss of self-esteem, depression, and

10   posttraumatic stress.  And she was diagnosed with posttraumatic

11   stress and she went to him for depression and anxiety.

12          At the end, his report makes clear that but for what

13   she endured, she wouldn't have done what she did.  And I'll say

14   it again.  She did it and accepts responsibility for it.  But

15   the notion that it didn't happen, the notion that just somehow

16   after she graduated law school with an impeccable background,

17   with a loving family, with parents that she wanted to take care

18   of, her father she saw through cancer, with a mother that was

19   sick, she just all of a sudden became a criminal?  And then she

20   went and committed a fraud?  With no monetary gain to be had

21   when it started?

22          It is not hard to believe that Brandon Lisi

23   manipulated her the way he has so many others.  You've read the

24   letters of support.  I'm not going to talk about many of them.

25   I want to talk about her father, if I can.  I made a quote for

you in our memo.  I'm Greek, I speak Greek, and this thing he

said to her at my conference table, "My love, sometimes you

break a glass, and when you pick it up you got to be careful

you don't just cut yourself to death."  Something like that.

This is a good family.  This is a good family who raised a good

girl, and then a good woman.  Didn't raise a criminal.  She

never stole anything in her life.  She didn't do this for

money.  And I truly believe that all she wanted to do was to

make them proud and be a good lawyer.

          I have searched in every paper, in every deposition,

and I could have cited depositions where the back and forth

with the Bibbos, I'm not doing that, they're victims, and she

feels bad and we get it.  But, this is just not a criminal or

anybody that ever woke up in the morning and decided to be one.

And I have searched this case and the terabyte of discovery and

every document that I could find.  And I don't find anything

that explains what she did, except that which we have presented

to you today.

          And I believe the witnesses that I've spoken to, and I

believe based on every ounce of conduct that I've seen from

Lisi, that there really is no other explanation.

          So when the government talks about the deterrence, I

respectfully disagree.  All she needs to do is get better.  She

needs to recognize what happened to her, she needs to make sure

it never happens again, because you don't need to deter

1   somebody who was never inclined to do it to begin with, but did

2   it because she suffered from something.

3          As for general deterrence, I don't know what the

4   public would say right now.  It is always my biggest problem at

5   sentencing, and it is judges' big problem often when they do

6   not believe specific deterrence is necessary.

7          The last time Kat, as we call her, smiled was when she

8   held a newborn in her arms.  The time before that is when Steve

9   married her, because she never thought he would, and frankly,

10  didn't think he should.  The time before that, the time before

11  that was when she graduated law school.

12         It's really been a tragic time for her as well.  And

13  in the same way, Judge, you said before that somebody could be

14  savvy in real estate and still be victimized, you're

15  100 percent right, and that is what happened here.

16         You can also be guilty of something, a crime, a

17  serious crime, and still be a victim and still go through a lot

18  of pain and anguish.  Those two things do not negate each

19  other.

20         I'm done.  There are many things you can do here.

21  Probation has recommended a year and a day.  The guidelines are

22  27 months.  I don't say this often, but I don't respectfully

23  believe that she should go to prison.  Because I think there

24  are many things that you can do to satisfy the goals of

25  punishment in this case.  There is countless community service,

1    there is home confinement, there are many ways that you can

2    structure a sentence that will allow her to move on, and

3    continue to get therapy, continue in her groups, and move on

4    with her life without one single ounce of disrespect or lack of

5    recognition to these victims.

6              As for disparity in sentences, you'll be avoiding it

7    if you do that.  That is my honest opinion.  Okay.  So the guy

8    who has been committing crimes since 2005, committing them

9    while on supervised release, lying to judges one after the

10   other after another, gets 38 months consecutive.  That's fine.

11   And you will be doing no injustice by recognizing that she

12   doesn't need to.  That's just my humble opinion.  And I thank

13   you for your patience and your courtesy.

14             THE COURT:  Thank you very much.  Just one moment.

15   We're going to take a few minutes break.  We'll come back in a

16   few minutes.

17             (Recess)

18             THE COURT:  Ms. Arvanitakis, at this time if you'd

19   like to speak, I would be happy to hear from you.  If you're

20   more comfortable being seated, please do so.  In either case, I

21   want you to get a microphone closer to you because I want to

22   make sure that we all hear you.  Thank you.

23             THE DEFENDANT:  Thank you, your Honor.  Thank you for

24   the opportunity to address this Court.  I am going to ask that

25   the Court kindly excuse the papers, but I had to write my

1  thoughts down because I didn't think I could get it through

2  verbally.  So I wrote it down.

3          THE COURT:  Of course.

4          THE DEFENDANT:  At the outset, please understand that

5  I do recognize that my actions and inactions have victimized

6  people.  That came at a substantial financial and emotional

7  cost to them.  I am deeply sorry for this.  The government has

8  suggested in their memorandum that I've not fully grasped the

9  importance of my role in this matter.

10         THE COURT:  I am going to ask again, and I know you

11  don't realize how quickly you are speaking.  I want to make

12  sure we all hear you and understand it, so could you speak

13  slower.

14         THE DEFENDANT:  Sure.

15         The government has suggested in their memorandum that

16  I have not fully grasped the importance of my role in this

17  matter.  That's not true.  My role in this case has put me

18  exactly where I stand right now, and I deserve to stand here

19  right now.

20         I'm truly a broken woman in every conceivable aspect.

21  I have lost my licenses to practice law in the profession that

22  I've always dreamed of, I have lost every ounce of financial

23  security imaginable, and I will spend the rest of my life

24  paying for my actions as well as the money that has been lost

25  as a result.  I've lost my pride, my self-worth, and my

1    confidence as a woman.  I have gutted my parents' pride,

2    regardless of what they say.

3         I need to express that what I did in this case is not

4    the product of who I was raised to be or intended to be.  I

5    graduated law school with the best intentions in mind and with

6    great aspirations.  The day of my graduation was the best day

7    of my life up until a month ago when I gave birth to my

8    daughter.  I cannot describe the pride that I felt, the

9    happiness, the dreams I had.

10        My parents raised me to be a good person, and they did

11   everything they could to help me and take care of me.  That

12   required a lot of sacrifice, including my father getting up and

13   going to work even though he was suffering through cancer, just

14   so he could provide the best for us.

15        I cannot describe to you the feeling I had when the

16   time came for me to take care of them.  It was my turn.  I was

17   going to make them beam with pride every day for the rest of

18   their lives and make sure that they wanted for nothing.

19        Looking back now, after having gone through therapy

20   and self-reflection, I realize that all that changed the day I

21   met Brandon Lisi.  When I met Brandon I was 23, fresh out of

22   law school, and very naive.  I fell for him almost immediately.

23   He was in his 30s, wise in the ways of the world, charming,

24   charismatic, smart, and portrayed himself to be an experienced

25   attorney who would take me under his wing and help me become a

1    good attorney and litigator.  I trusted him.  I believed in him

2    and I relied on his promises to me.  He was larger than life.

3        When I found out about the indictments, I know I

4    should have run for the hills, but I didn't.  I can't explain

5    it.  I am starting to understand now with the help of support

6    groups and therapy, but every day for the past several years, I

7    just want to bang my head against the wall until it breaks.  I

8    always thought of myself as a strong woman.  In some ways I

9    was, but when it came to him I ultimately wasn't.

10       My parents raised me to be strong and independent.  I

11   let them down, just like I let down the victims in this case as

12   well as myself.  I should have been stronger and I should have

13   seen through the false promises being made and the web of

14   deceit that was ultimately created and that my actions and

15   inactions cultivated.  It was my role, no matter how minor,

16   that nourished this web, and for that I absolutely take full

17   responsibility.

18       When Brandon was initially indicted, he told me that

19   the cause for his indictment was not as a result of his actions

20   but rather the actions of others.  I wanted to believe him.

21   His ability to spin a story in ways that benefit him is

22   absolutely amazing.  I believed that he was being wrongfully

23   persecuted, and therefore I wanted to stand by him.

24       Brandon was convinced that if he could mitigate his

25   losses, he would avoid prison.  The way he explained it made

1   sense and I wanted to help him.  I wanted to believe him.  I

2   didn't want him to go to jail.  Simply, your Honor, I wanted to

3   be with him.

4         It was this motivation that began this tailspin with

5   various deals and investments that at first glance could be

6   profitable for the investors, and while facilitating Brandon's

7   goals.  It was a win-win situation.  The investors would make

8   their money while assisting Brandon in mitigating his losses.

9         What happened after that has become a blur.  I know

10  that none of the investments worked.  Consequently various

11  misrepresentations about how the investments were being handled

12  and where the rest of the money was going were made.  I allowed

13  myself to join Brandon in these misrepresentations.  I again

14  take full responsibility for that.  I was so convinced and so

15  blind, that I put my own financial security at risk by giving

16  him money from my own practice at the time and even took out

17  loans for his benefit.  I've even repaid loans that he took

18  from other people that I found out about after the fact.

19        My motivation for doing all this was to help Brandon.

20  There was no financial gain for me.  I did it for him.  Not

21  just because he demanded it, but because he needed it.  And if

22  he needed it, I guess I believed that I needed it also.

23        I couldn't appreciate at the time what was happening

24  to me.  It has been a very difficult process, one that I'm

25  still undergoing and trying to come to terms with, the fact

that my judgment could be so clouded as to not recognize the

scheme for what it was, and to recognize Brandon for who he

truly was.

What James has told you is true, your Honor.  There

was nothing in this for me financially.  Absolutely nothing in

this financially for me.  I borrowed money to give him and I

lost it.  I have lost everything.  I borrowed money from my

father, my practice, and from others.  I was working day and

night on legitimate cases, the money would come in, and he

would take it.  He would take it to pay for things like his

health insurance, his rent, his cellphone, his car payment, his

mother's expenses, his mother's aides.  Whatever the money was

needed for, he would just take it.  Everything was for him, and

I just -- there was nothing in it for me except for Brandon.

I loved him and then I hated him and back and forth

again.  But in the end, I wanted to be with him.  I can't

explain how or why I allowed the abuse to start and to

continue, but I now realize it was a slow and steady

progression.  The verbal, emotional, and physical abuse did

something to me.  It changed me.  It made me unable to see what

was right in front of me.  He manipulated me.  I found myself

isolated and got to the point where I couldn't make the

simplest decision without running it by Brandon first.  If I

did, there would be consequences.  I would be berated and

humiliated.  I couldn't see how wrong the belittling and

slapping and the threats and humiliations and shamings were,

even though they were tearing me part.  I would get angry and

say it was over.  But my anger was met with more threats, and

these threats included threats against my family, my career,

and my now husband.

        Following the threats he would come back a different

man.  He would apologize, he would be remorseful, and he would

just try to make it right.

        The only two friends that have remained by my side

throughout all this, Angie and Melissa, and even Nadine, would

ask me how I would let him treat me that way.  I would tell

them they're right, but inevitably he would make it right

again.

        This abuse was not in secret.  One afternoon while

Brandon, Paul Bibbo, and I went to lunch, Paul witnessed

Brandon slap me during an argument at the restaurant.  This was

in public, lunchtime, at a public restaurant.  I was

backhanded.

        On several occasions various clients, including Paul

and his wife Nadine, witnessed the fights that Brandon and I

had in the office where Brandon would be verbally abusive.

        On another occasion, while Brandon was on house

arrest, he had a hospital bed put in the house for his mother.

Brandon asked me to go to the house, we had a disagreement, one

of many.  I put my coat on to leave.  When I went to leave the

1  house, he grabbed me and just pulled me by my hair down and I

2  hit my head by the metal rod of the hospital bed.  Originally

3  when I was -- when Melissa rushed me to the hospital, they

4  thought I had a neck fracture, and thankfully it was only a

5  concussion.  I told the hospital staff what happened, but I

6  didn't give them his name because he was already in legal

7  trouble, I didn't want to add.

8          Brandon came to the office the next day and

9  apologized.  He even cried.  I believed him.  Yet again.  I

10  believed him when he apologized and felt loved when he bought

11  me gifts.  Ironically, those gifts were bought with my money.

12  I believed not just his words, but what had become my own

13  thoughts that somehow this would all work out and the

14  investments would somehow work out, and he was going to pay

15  back the money and things would be okay.

16          There were times when I could see glimpses of what was

17  really happening.  The fear and chaos of what had become my

18  life, emotionally, physically, and financially, tore me apart.

19  My fear made it impossible for me to leave.  I didn't think I

20  could ever get away.  The constant threats to family and to me

21  rendered me essentially powerless.

22          While the abuse may not have been a secret the

23  strangers, I kept it from my family in fear that they would

24  explode and things would only get worse.

25          This fear is one that continues to the present date.

1    Your Honor, even after today's sentencing, this is not over.

2    Brandon will retaliate just like his latest efforts

3    demonstrate.  The civil actions continue, and I am sure Brandon

4    will find a way to make good on his threats against me and my

5    family.

6            THE COURT:  What threats are these?

7            THE DEFENDANT:  The threats always change.  They were

8    basically he was going to come after my family, he was going to

9    make sure they were homeless, he was going to attack my father.

10   My mother was already in the hospital.  It was back and forth

11   for many years.

12           I am deeply ashamed of what I did and I have no

13   illusions as to how illegal and unethical my conduct was.  I

14   can't forgive myself for being suckered by this man nor can I

15   forgive myself for what I did.  I was an attorney and I should

16   have done more and my actions are inexcusable.

17           Through therapy and support groups I have joined, I am

18   starting to understand all of this.  I am in a group called

19   Narcissistic Abuse Survival and Healing.  It is a support group

20   for people in abusive relationships.  Brandon may not be a

21   narcissist by any doctor's -- he's a narcissist, your Honor.  I

22   don't care if he was ever diagnosed or not.  He is textbook

23   narcissist.

24           I am amazed at how powerful and strong women can be,

25   and yet how weakened by men they can succumb to.  They fall in

1  love with them, and they take advantage of them.  I am amazed

2  and yet now understand how and why these women stay in these

3  relationships just like I did.

4          I am not telling you these things as an excuse.  I

5  tell you them because I need you to know that I am not the

6  person anymore.  I am not the person who needed to be picked up

7  off the floor when the threats and berating were at their

8  worst.  I am going to continue my therapy and ensure I never go

9  back to being that person again.

10          I am in a healthy, loving, supporting marriage with

11  Steve and we have a beautiful new baby.  You do not need to

12  ever worry about me committing another crime.  My dear husband,

13  who should have walked away given all that has happened,

14  married me and has stood by me.

15          I'm sorry, your Honor.

16          THE COURT:  That's fine.

17          THE DEFENDANT:  After years of trying to have a child,

18  going to fertility clinics, doctors, wondering if I'll ever be

19  a mother, I finally got pregnant unexpectedly, and we had our

20  daughter Stavroula only a month ago.  I don't think I can live

21  being separated from her.  I don't want to live separated from

22  her.  I can't let her down on her first days on this earth.  I

23  won't be able to handle it.  The thought of being separated

24  from her is devastating.  I want nothing more than to be with

25  her and give her all the love and support and strength she

1  needs and deserves.  I can't let her down, like I have my

2  family, my husband, and my friends.

3        My mother is dying.  She has end-stage renal failure.

4  The stress of this case and of my future is adding to her

5  agony.  I am killing her faster.  My father, as strong as he is

6  and as strong as he tries to be for me, is broken.  He cannot

7  care for my mother without me, and as much as he tries to hide

8  it, he is ashamed of me.  He should be.

9        I accept full responsibility for my role in this

10  situation and regret any harm that I have caused.  The victims

11  in this case, however, extend well beyond the purview of this

12  court.  The victims include my family and my friends as well as

13  the legal community for which I have shamed.

14        I have suffered for several years.  I have been

15  humiliated, disbarred, financially destroyed, prosecuted

16  civilly and criminally, and left to pick up the pieces and try

17  to become the woman, and more importantly, the mother that my

18  daughter needs.

19        Please don't misunderstand me.  I deserve to have gone

20  through all this.  It was my actions that led to the suffering.

21  I'm merely trying to express to this Court how broken all of

22  this has made me.  Essentially, I can't take anymore.  I've

23  lost absolutely everything, and pray that this Court allows me

24  to stay with my baby.

25        I am begging you to forgive me and to understand that

1    I will feel the effects of this case forever.  I apologize to

2    the victims, I apologize to your Honor, I am truly very sorry

3    for all of this.

4              THE COURT:  Thank you very much.  Please be seated.

5              I saw a lot of rustling at the front table, which I

6    know you did not mean to distract Mr. Kousouros.  Is there

7    something you wish to say to me?

8              MS. REILLY:  There is, your Honor.

9              THE COURT:  What is that?

10             MS. REILLY:  There were some factual representations

11   in Mr. Kousouros' presentation that I think are inaccurate and

12   inconsistent with the PSR.  As you might imagine, there are any

13   number of arguments that we have disagreement about, and that

14   of course is totally appropriate.  I wouldn't seek to speak

15   again if I didn't think there were factual issues that have

16   been created by his presentation that fly in the face of their

17   decision not to object to these portions of the PSR.

18             THE COURT:  Okay.

19             MS. REILLY:  If I can touch on them very briefly.

20             THE COURT:  Are there sections of the PSR to which you

21   wish to direct my attention?

22             MS. REILLY:  They were broad statements, and I can

23   point to the specific portions of the PSR that I think they

24   conflict with.  The first, and I think the most important,

25   Mr. Kousouros said at some point, he said repeatedly that the

1    investments at issue were viable in the beginning, and he said

2    at one point that was uncontested by the government.

3           That is very much contested by the government, your

4    Honor, and I would point, for example, to paragraphs 19, 22,

5    26.

6           THE COURT:  Wait, wait.  For those of us -- thank you.

7    19, 22, and 26.

8           But let me, I believe you heard as well

9    Ms. Arvanitakis speak that the belief was that was a win-win,

10   that these particular real estate transactions would both yield

11   profits for those who invested in them and provide a means for

12   Mr. Lisi to bring something to the table at his sentencing.

13   You disagree with that?

14          MS. REILLY:  We do, your Honor.

15          THE COURT:  Tell me why.

16          MS. REILLY:  Your Honor, I think the PSR is clear that

17   there are two issues.  One, the investors, when they made these

18   investments, were not told very basic facts that made these

19   deals not viable and made the win-win, as it was put, unlikely

20   or impossible.

21          For example, they were not told that these properties

22   were tied up in most cases in the criminal cases of Mr. Lisi,

23   that there were significant issues as to clarity of title, in

24   at least one case that those properties were the subject of

25   fraudulent bankruptcy proceedings.  So at the very outset,

1    these investments and the inducements of money into those

2    investments were predicated upon lies and misrepresentations.

3    And I do not think it is accurate to say they were viable or

4    could have led to some windfall for the victims.

5              THE COURT:  Is it your position that Mr. Lisi -- and

6    I'm being careful with these questions -- knew from the start

7    when these solicitations for funds from client investors, was

8    it deliberately hidden from these client investors that there

9    were these clouds on title and other properties?

10             MS. REILLY:  Yes, your Honor.

11             THE COURT:  Mr. Lisi was aware of these problems with

12   the, for lack of a better term, the provenance of these

13   properties.

14             MS. REILLY:  Hmm-hmm.

15             THE COURT:  Was Ms. Arvanitakis aware at the time the

16   solicitations were made that there were problems with these

17   properties?

18             MS. REILLY:  So, what I think we can safely say is

19   that Ms. Arvanitakis was aware that these properties, at least

20   some of them, were involved in the criminal cases.  The extent

21   of her knowledge about the specific title issues, I can't speak

22   to.

23             THE COURT:  Okay.  So you won't.

24             MS. REILLY:  I won't.  But if I can go one step

25   further, and I think even to the extent there is disagreement,

1    which I sensed from behind me, there might be about

2    Ms. Arvanitakis' awareness of the involvement of these

3    properties in the criminal cases, it could not be the case that

4    anyone believed that this was likely to lead to some kind of

5    windfall for the victims.

6            THE COURT:  I don't need a windfall.  Was there any

7    chance of them getting any money on these deals?

8            MS. REILLY:  Certainly.  What I would point you to is

9    there are places in the PSR, paragraph 32 is one example, that

10   talk about the fact that when the money was put in by the

11   victims, it was not set aside for investment or transferred to

12   the people who held title.  For the most part, it was used to

13   pay the personal expenses of the defendants.

14           So, perhaps I'm an unsophisticated real estate

15   investor, but I can't quite see how money of the victim that's

16   being spent to pay, for example, costs related to

17   Ms. Arvanitakis' office and other legal fees could then be used

18   to further some gain to them in the form of a real estate

19   investment.  And that brings me to the second factual issue

20   that I think Mr. Kousouros' presentation raised, which was the

21   repeated statement that at the beginning of these deals there

22   was no money to be had for Ms. Arvanitakis.

23           THE COURT:  There was nothing monetary in it for her.

24           MS. REILLY:  Right.  I think that is belied by the

25   record and the account in the PSR about the money that flowed

1    through her accounts, and in some cases, fewer than those used

2    for Mr. Lisi was used to pay her expenses.

3              THE COURT:  I believe, and I'll let Mr. Kousouros

4    speak in a moment, I believe I understood him to be saying that

5    her account was being depleted on a frequent basis by Mr. Lisi.

6    And so, it wasn't as though she was making money.  This was

7    simply replenishing that which he had taken from her.

8              MS. REILLY:  I think it is inaccurate to say it was

9    only Mr. Lisi's debts or Mr. Lisi's costs or expenses that were

10   being satisfied by these victim funds.  To use just one

11   example, Mr. Kousouros referred to $35,000

12   Ms. Arvanitakis borrowed from her father to pay off expenses

13   related to the dissolution of the Dente legal practice.

14             THE COURT:  Yes.

15             MS. REILLY:  Just to be clear, Mr. Kousouros implied

16   Mr. Dente walked away and sort of abandoned the practice.  He

17   was arrested and so the practice, which was almost entirely

18   criminal, could not continue.  But the $35,000 --

19             THE COURT:  One moment, please.  When you say the

20   practice was almost entirely criminal, do you mean he was

21   practicing criminal law or the practice was --

22             MS. REILLY:  I don't --

23             THE COURT:  -- was ridden from top to bottom with

24   fraud.

25             MS. REILLY:  The latter.  The $35,000 that

Ms. Arvanitakis borrowed from her father to pay those expenses,

it is our understanding from our financial analysis that that

money was repaid to Ms. Arvanitakis' father with victim funds

from this case.

So I think it is very much the case, and that is just

one example, there are others in the PSR, that it was in some

instances fewer by all accounts than Mr. Lisi, it was

Ms. Arvanitakis' expenses, Ms. Arvanitakis' debts, the people

around Ms. Arvanitakis who benefited financially.  And I do not

think it is accurate to say that there was no money to be had.

THE COURT:  Let me stop you for a moment.  You have

heard argument from the back table to the effect that her

principal reason for involvement was to assist Mr. Lisi.  Do

you disagree with that?

MS. REILLY:  Your Honor, I can't speak to how

Ms. Arvanitakis in her own mind weighed the potential benefits

of involvement in this scheme.  But I do not think it comports

with her conduct to say that she was only there to support

Mr. Lisi and had no financial gain to be had.  And the

management and routing of the money in this case I think belies

that assertion.

THE COURT:  Let me ask a better, more precise

question.  Is your belief that she engaged in this conduct to

deal with her own problems in the management of her practice as

distinguished from whatever issues Mr. Lisi had with the

1    criminal justice system?

2            MS. REILLY:  I think, your Honor, as in most fraud

3    cases, the conduct was engaged in for a wide variety of

4    reasons, one of which was to enrich this defendant.

5            THE COURT:  All right.  Anything else you'd like me to

6    know?

7            MS. REILLY:  A very small point, but to correct the

8    record, Mr. Kousouros pointed to checks he attached to his

9    submission that he represented were used to give money to

10   victims, specifically the Bibbos to help them satisfy costs

11   they were incurring.  We had pointed this out in our

12   submission, a number of those checks bounced.  They aren't

13   properly funds that were given to the victims.  And so I

14   thought it was important to correct that factual statement as

15   well.

16           THE COURT:  All right.  Anything else?

17           MS. REILLY:  That's it, your Honor.  Thank you.

18           THE COURT:  Mr. Kousouros, I'm sure you wish to be

19   heard.

20           MR. KOUSOUROS:  One quick second.  None of these

21   checks bounced.  You have the front and the back of them on

22   Exhibit J.  There were other checks that bounced.  As a matter

23   of fact, when we were negotiating with the government, we

24   thought that the number was much higher.  The government

25   correctly pointed out that some of the checks that

1    Ms. Arvanitakis wrote bounced.  But if you look at every one of

2    these checks on Exhibit J and the bank records we have

3    attached, we believe that these all, they were cashed, they

4    were cashed and they didn't bounce.  That is our understanding.

5         I think the more salient point though that I was

6    making is, and look, if I'm wrong, I'm wrong, but we attached

7    both sides of the checks, and I think the more salient point

8    was it was Ms. Arvanitakis writing the checks.

9         In terms of the deals, my understanding is the

10   bankruptcy came later, and I think I may have said or meant to

11   say that's the way he pitched it, and it did make sense.  And

12   in terms of my review of all the paperwork, they could have

13   worked.  They were tied up in the criminal cases, to the extent

14   that they were a product of the fraud in these cases, but my

15   understanding absolutely was that the debts could be purchased

16   and we've described it to you in our memo.  Now, is that

17   100 percent true?  It is our understanding, but I will say

18   this:  It was absolutely Ms. Arvanitakis' understanding that if

19   they purchased the debt cheaper than what was owed, there would

20   be equity enough for the creditors to get paid.  So it was

21   truly what her understanding was.  And it is my understanding,

22   at least with Cold Spring Harbor and the Sag Harbor properties,

23   that was the case.

24        You heard us.  There was nothing in it for her in

25   terms of profit.  In terms of making money.  And it really was

1    a matter of replenishing amounts that came out of her operating

2    account.  Certainly she did not go into this for money.

3              THE COURT:  Thank you.  All right.

4              Ms. Arvanitakis, I'll let you know I do not come out

5    on the bench with a preconceived sentence.  I normally take a

6    break.  Now, we did take a break, but I'm taking another one

7    because I don't begin thinking about the proper sentence until

8    I've heard from everyone, and I wanted to hear from you.

9              So I am going to ask for everyone's indulgence for a

10   few moments while I go in the back.

11             (Recess)

12             THE COURT:  I do appreciate that this takes time and

13   you've committed a lot of time to be here this afternoon.  But

14   it is to me the fairest way of addressing all of the issues in

15   this case is to sit down after I've heard from everyone.

16             I'm going to outline the sentence that I intend to

17   impose, but I am going to give the attorneys a final

18   opportunity to make legal objections to me before I actually

19   impose this sentence.

20             We've had a lot of discussion today about the 3553(a)

21   factors.  I have considered them, and I'll mention some of them

22   that play a role in the sentence I intend to impose today.

23             The nature and circumstances of the offense, the

24   history and characteristics of Ms. Arvanitakis, the need for

25   the sentence imposed to reflect the seriousness of the offense,

to promote respect for the law, to provide a just punishment

for the offense, to afford adequate deterrence to criminal

conduct, to protect the public from further crimes by

Ms. Arvanitakis, to provide her with needed educational and

vocational training, medical care or other correctional

treatment in the most effective manner.

I must consider the guidelines, and I have considered

the guidelines.  I'll speak about them momentarily.  I must

consider the need to avoid unwarranted sentence disparities

among similarly situated defendants, and I must consider the

need to provide restitution.

The guidelines calculations are those that replicate

what is in the plea agreement and what is in the PSR.  There is

a base offense level of 7, a 14-level enhancement for the loss

figure, a two-level enhancement for the fact that victims

suffered financial hardship, a two-level reduction for minor

role, a three-level reduction for acceptance, and an adjusted

offense level of 18.  There are no criminal history points.

The criminal history category is therefore I, and the resulting

guidelines range is 27 to 33 months.

The defense has asked for a sentence of no jail time.

Government has asked for a sentence within the guidelines

range.  And the probation office has recommended a sentence of

a year and a day.

I want to begin by noting that no one, no one I've

1  sentenced is all good and all bad.  And certainly,

2  Mr. Kousouros's very careful, very thoughtful submission gives

3  me the insight that I need, as does the presence of

4  Ms. Arvanitakis' friends and family, to the good that she has

5  done and continues to do.  She is a good daughter, a good

6  friend, a good wife, and a good mother.  And that's obvious

7  from the letters that I was given.

8          And counterbalancing that is the conduct that brings

9  us here today.  And I remain struck by this conduct.  The

10 period of time over which it took place, the sophistication of

11 it at times, even if that came about because deals just fell

12 apart and had to be patched back, to the conduct.  And

13 Ms. Arvanitakis knows this is reprehensible.  It is egregious

14 and it is extraordinary that it comes from someone who was a

15 practicing attorney.

16         I've looked at the transactions, and I wasn't there at

17 the pitch meetings for them, but I find it difficult to believe

18 that someone with a law degree and a background in real estate

19 law would counsel their clients to participate in these

20 transactions.  Particularly knowing the situations of the

21 clients.  And what comes to mind is Ms. Klein's recent status

22 as a widow and Mr. Bibbo's medical conditions that very likely

23 necessitated finances.

24         And so while Ms. Arvanitakis may well have been

25 affected if not blinded by her feelings for Mr. Lisi, I think

1    there were other interests involved as well, including the

2    preservation of her practice.  And even if she were extremely

3    and perhaps even appropriately concerned about Mr. Lisi,

4    believing as she did at the time that he was being prosecuted

5    improperly, nothing justified the lies, the cheating, and the

6    theft from clients.  And I'm confident that had she and

7    Mr. Lisi been fully candid with these clients, they would not

8    have participated.  And she shouldn't have suggested that they

9    do.

10           I also don't fully understand, and therefore I won't

11   fully consider this a negative, what happened in the civil

12   litigations that followed.  But I am disturbed by the fact that

13   a defamation lawsuit was filed against people that I am now

14   told and everybody concedes are victims.  I understand, I

15   believe, Mr. Kousouros's point which was that one can be a

16   victim and entitled to restitution, and yet still have, perhaps

17   because of the concerns of the situation, perhaps because of

18   the magnitude of losses, might still say things that are

19   factually inaccurate.  But I think a defamation suit was a poor

20   way to go.

21           So we talk now about the mitigating factors that have

22   been presented to me and there are many and considerable.  I am

23   aware and I appreciate the discussion that Mr. Kousouros had

24   regarding the guidelines.  I now in a way that I did not

25   originally a few years ago appreciate the discretion I had and

1    the appropriateness of individualization in the sentences I

2    impose.  I do disagree with his reads on Gupta and Adelson with

3    which I have personal involvement, because those cases involved

4    very large losses, occasioned by very small bits of conduct.

5    More than the extensive conduct that was at issue here.  There

6    were also more actual, more felt losses here.  But that's one

7    issue, and his larger point which is the need for

8    individualization at sentencing is absolutely right.

9            I have thought very much about the arguments, the

10   principal argument that's been made that Mr. Lisi had some

11   control over Ms. Arvanitakis' conduct.  And I understand and am

12   quite disturbed by some of the allegations that have been made.

13   But I've also heard the conduct in which she did engage, I have

14   heard from the victims who have spoke this afternoon and who

15   have written letters to me.  And I've observed Ms. Arvanitakis

16   at court proceedings before me where she did not strike me as

17   someone who was a wallflower, who would be subservient to

18   someone else.

19           So I will accept that there is some degree to which

20   she did things to please or placate Mr. Lisi.  But it does not

21   in my mind justify fully the horrific conduct in which she

22   engaged.

23           I accept as well that there were significant losses to

24   Ms. Arvanitakis and to her family and those who love her.  That

25   does happen, and it is a very unfortunate thing that it does.

 1  And I accept that there has been much change in her life since

 2  her arrest.  There has been the therapy that she has benefited

 3  from, the support groups that she attends, the support and

 4  stability provided by her husband, by her daughter, by her

 5  father, by all who love her who have been here through these

 6  proceedings and here today.

 7          The issue for me is the degree to which I can vary

 8  downward based on these facts.  And the issue is that almost

 9  everyone I sentence has families, and the vast majority of them

10  have very small children.  And so, I cannot use that alone as a

11  basis, because it is the case in almost all of my cases.

12          So, I am left balancing the good and the bad of

13  Ms. Arvanitakis.  And what struck me about what she said, and

14  there were many goods things in which she said, was one point

15  that I wrote in my notes, and it was her description and her

16  coming to terms with -- and these are her words and not mine --

17  my role, no matter how minor.  And that struck me, because I

18  think that even now she doesn't understand the devastation of

19  the conduct.

20          And so, for many reasons, including the nature of the

21  conduct, the role that she had, the trust that she abused, the

22  money that was lost, the very, very unfortunate family

23  circumstances that now befall the victims in the case, I'm

24  imposing a term of 24 months' imprisonment.  So I'm downwardly

25  departing only slightly from the guidelines.

1      I will order that term of imprisonment be followed by

2   three years of supervised release with the mandatory, standard,

3   and special conditions I've outlined.

4      I will order as well a consent preliminary order of

5   forfeiture that has been handed to me this afternoon.  And that

6   requires forfeiture in the amount of $1,285,393, and

7   restitution pursuant to the restitution order that I have been

8   given, which has for the victims in this case restitution

9   figures of $350,000, $826,358, and $109,035.

10     I do see and I think it was deliberate that it

11  replicates the order of forfeiture.  Ms. Reilly, was that

12  intentional?

13     MS. REILLY:  That's correct, your Honor.

14     THE COURT:  So I presume it is also the case -- well,

15  is it the government's contemplation that amounts received in

16  forfeiture would perhaps be remitted or restored to the victims

17  in this case?

18     MS. REILLY:  Your Honor, my understanding is that's a

19  matter handled by our financial litigation unit based on

20  applications from those parties, and so I'm not in a position

21  to speak to it.  Certainly to the extent that I can facilitate

22  that taking place, I will make sure that the victims have the

23  information that they need to make those applications.

24     THE COURT:  Certainly, I'm not in a position, I'm not

25  allowed to ask you to do anything with that money that is

1   received in forfeiture.  I just note the identity of numbers.

2            I'm not imposing a fine, given the financial penalties

3   already imposed in this case.  I am imposing the mandatory

4   special assessment of $100.

5            Ms. Reilly, is there any reason why I may not impose

6   this sentence?

7            MS. REILLY:  No, your Honor.  If I can make one note

8   about the restitution order.  This is my error for not

9   including it.  The schedule of the restitution contains

10  personal identifying information of the victims, so we'd ask it

11  be filed on the public docket either under seal or in redacted

12  form.  We would be happy to submit a redacted version.

13           THE COURT:  We'll redact the identifying information

14  on the last page of the schedule of victims.  I was going to

15  make sure that did not make the public docket.  Thank you.

16           MS. REILLY:  Thank you.

17           THE COURT:  Other than that, is there any reason why I

18  may not impose this sentence?

19           MS. REILLY:  No, your Honor.

20           THE COURT:  Mr. Kousouros, we can speak later about

21  issues of designation and about a surrender date.  At this time

22  I want to know whether there is any legal reason why I may not

23  impose the sentence I've outlined.

24           MR. KOUSOUROS:  There is no legal reason.

25           THE COURT:  Ms. Arvanitakis, please stand.

1    Ms. Arvanitakis, after considering the sentencing factors set

2    forth in Section 3553(a) of Title 18 of the United States Code,

3    I find that a term of 24 months' imprisonment is sufficient,

4    but not greater than necessary, to comport with the purposes of

5    sentencing.

6              I will order that that term of imprisonment be

7    followed by a term of supervised release of three years with

8    the mandatory, standard, and special conditions outlined in the

9    presentence report.  I will impose restitution and forfeiture

10   in the manner I've just outlined, and I will also impose a $100

11   mandatory special assessment.

12             Do you understand?

13             THE DEFENDANT:  Yes.

14             THE COURT:  Thank you.  Please be seated.

15   Ms. Arvanitakis, I will let you know that to the extent you

16   have not waived this in your plea agreement with the

17   government, you have the right to appeal from your conviction

18   and from your sentence.  And if that is something that is of

19   interest to you, I'd ask you to please to speak to

20   Mr. Kousouros at your earliest opportunity.  It is my

21   expectation that the judgment of conviction will be filed

22   tomorrow or Monday, and your deadline to file a notice of

23   appeal would typically last for two weeks beyond that date.  Do

24   you understand?

25             THE DEFENDANT:  Yes, your Honor.

1      THE COURT:  Mr. Kousouros, I want to talk about two

2  things.  I want to talk about if there is a recommendation

3  regarding a place of designation.

4      MR. KOUSOUROS:  Your Honor, we would ask for a place

5  as close to New York so that her family can visit her.

6      THE COURT:  All right.  And Mr. Kousouros, as well, I

7  am aware of recent events in Ms. Arvanitakis' life, and I would

8  imagine that given that, a delayed surrender date might be the

9  most useful.

10      Now the government may well disagree with me and

11  that's certainly their prerogative.  But I was thinking of

12  something towards the end of this year to give her the most

13  time possible to bond with her child.  But if, sir, to be

14  clear, if for mental health reasons or otherwise that's

15  something that's not good for her, then I will listen.

16      Ms. Reilly, tell me now if you object.

17      MS. REILLY:  Your Honor, could we have one minute to

18  discuss this issue?  We hadn't contemplated a surrender date

19  quite that long.

20      THE COURT:  I understand.

21      (Pause)

22      MR. KOUSOUROS:  That would be acceptable to us, Judge.

23      THE COURT:  Thank you.

24      MS. REILLY:  Your Honor, I want to be cautious because

25  we haven't consulted with others in our office, and I know this

1    is an issue that does come up and the office tries to take a

2    consistent position.  So what I think we can say is that we at

3    this point do not take a position, and therefore do not object

4    or say otherwise as to that surrender date.

5              THE COURT:  Ms. Reilly, she has a one month old.

6              MS. REILLY:  I understand, your Honor.

7              THE COURT:  Okay.

8              MS. REILLY:  I'm saying that we don't take a position

9    and therefore we do not object.

10             THE COURT:  All right.  Mr. Kousouros, I'm going to

11   list Monday, January 7, 2019, at 2 p.m. as the surrender date.

12             MR. KOUSOUROS:  Thank you, Judge.

13             THE COURT:  All right.  Ms. Reilly, thank you very

14   much.  I appreciate the articulation of your office's position.

15             Is there anything else that you would like to address

16   in this proceeding?

17             MS. REILLY:  Your Honor, at this point the government

18   moves to dismiss the open counts.

19             THE COURT:  Thank you very much.  Mr. Kousouros, I

20   imagine you are not objecting to the dismissal of the motion to

21   dismiss the open counts.

22             MR. KOUSOUROS:  No objection, your Honor.

23             THE COURT:  That motion is granted.

24             Ms. Reilly, anything else?

25             MS. REILLY:  Nothing further from the government.

1          THE COURT:  Thank you.  Mr. Kousouros, anything else?

2          MR. KOUSOUROS:  No.

3          THE COURT:  All right.  Thank you very much.

4          Ms. Arvanitakis, I say this to everyone in your

5     position.  I hope that we not see each other in this context

6     again.  I imagine we won't, and I wish you the best with your

7     family.

8          THE DEFENDANT:  Thank you.

9          THE COURT:  We are adjourned.

10         (Adjourned)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25